## UNITED LIGHT & POWER CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 6890.

Circuit Court of Appeals, Seventh Circuit.
July 12, 1939.

868

Homer Hendricks, of Washington, D. C., and Thomas K. Humphrey and Kenneth F. Burgess, both of Chicago, Ill. (Miller & Chevalier, of Washington, D. C., and Sidley, McPherson, Austin & Burgess, of Chicago, Ill., of counsel), for petitioner.

James W. Morris, Asst. Atty. Gen., and Sewall Key and Maurice J. Mahoney, Sp. Assts. to Atty. Gen., for respondent.

Before EVANS, SPARKS, and TREANOR, Circuit Judges.

EVANS, Circuit Judge.

Did the taxpayer's (petitioner herein) exchange of securities constitute a "statutory reorganization" so that the profits realized therefrom were non-taxable? This is the question for our determination on this appeal.

The Board affirmed the Commissioner's determination of a deficiency income tax of $1,076,314.40 for the year 1928. There is no dispute as to the amount, if the Board's determination of liability be sound.

*The Parties.* The United Light and Power Company, petitioner-taxpayer, filed a consolidated tax return for the year 1928, for itself and subsidiaries, one of which was the United Light and Railways ("Railways"), which company participated in the exchanges of stock which afford the basis of petitioner's claim of a statutory reorganization. Railways was also a holding company of companies supplying electrical energy to the public. To carry out the contemplated exchanges of stock, it caused the Dexter Company to be organized, July 11, 1928, in New Jersey, and also caused the incorporation, at that time, of ten New Jersey corporations herein called the A-J New Jersey corporations.

The American Light and Traction Company ("American") was also a holding company, its subsidiaries being Milwaukee Gas and Light Company, and four New Jersey Companies (Mutual, Waverly, Bexley, Provident). It was primarily interested in gas utilities.

The Koppers Company ("Koppers") was the third large holding company which played a major role in these security exchanges. It dealt in coke products, etc., and its subsidiaries were Koppers Gas & Coke Company and Milwaukee Coke and Gas Company.

The asserted reorganizations involved the transfer of two large blocks of stock —Detroit Edison and Brooklyn Borough —held by Railways, to the newly created New Jersey Corporations in exchange for a large block of its stock. Absence of a *statutory* control of American by Railways is one of the grounds advanced by respondent to support his argument that there was no statutory reorganization. The Board found that all the transfers were part of one plan and for tax purposes were to be considered as a single transaction and not as a series of independent transfers. Respondent also argues that even if the transactions be divided and each step treated as a separate one for purposes of taxation, there was no statutory reorganization of Railways.

The situation before and after the transactions is as follows:

Before:

Railways had 75,000 shares of Detroit Edison stock and 39,582 shares of Brooklyn Borough stock.

After:

Railways had 131,248 shares of American.

American had all the stock of Dexter (and Dexter held the 75,000 shares of Detroit Edison).

American had all the stock of the 10 N. J. companies (and the N. J. companies had the 39,582 shares of Brooklyn Borough stock).

Graphically summarized, the transactions might be presented thus:

Respondent also contends that Railways did not maintain sufficient continuity of interest because the transferred assets went to a *subsidiary* of the company of which it acquired control, and not to said company.

He also argues that if it be conceded the initial exchanges of each of the two transactions—between Railways and the

The net result was that Railways received 131,248 shares of American in exchange for American's receiving all stock of subsidiaries which held all the Edison and Brooklyn stock which Railways had given on reorganization. Instead of Railways' having direct ownership of the Edison and Brooklyn stock it (and a subsidiary) held or controlled the majority voting stock in the company (American) which owned all the stock of the corporations which now held said Edison and Brooklyn stock.

*Financial Aspects of the Transactions.* While there is no dispute as to amounts involved, we briefly state, for the purpose of clarity, the facts as to value of stocks.

Railways originally acquired the 75,000 shares of Detroit Edison at a cost of $11,490,432.32, and the 39,582 shares of Brooklyn Borough stock at a cost of $4,424,707.53. In the final exchange for the Edison stock, Railways received 75,000 shares of American stock of the fair market value of $15,000,000. The gain was $3,509,567.68. In the final exchange of the Brooklyn stock, Railways received 56,248 shares of American having a fair market value of $11,249,600. Its profit over cost was $6,824,892.47. The total gain of $10,334,460.15 from the combined transactions was subject to a tax of $1,076,314.40.

newly formed subsidiaries—were non-taxable statutory reorganizations, the next step—the immediate transfer of the newly formed subsidiaries' stock to American for its stock—was an integral part of a single plan and changed the legal aspect of the transactions, which change resulted in taxable gain (the difference between the cost price of the Edison and Brooklyn stock to Railways and the value of the American stock finally received therefor).

The controlling statutes are:

Revenue Act of 1928, c. 852, 45 Stat. 791, 816:

"Sec. 112. *Recognition of gain or loss.*

"(a) *General rule.* Upon the sale or exchange of property the entire amount of the gain or loss * * * shall be recognized, except as hereinafter provided in this section.

\* \* \* \* \* \*

"(b) * * * (3) Stock for stock on reorganization. No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

"(4) Same—Gain of corporation. No gain or loss shall be recognized if a cor-

poration a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

"(5) Transfer to corporation controlled by transferor. No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

\* \* \* \* \* \*

"(i) *Definition of reorganization.* As used in this section and sections 113 and 115—

"(1) The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

"(2) The term 'a party to a reorganization' includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

"(j) *Definition of control.* As used in this section the term 'control' means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation." 26 U.S.C.A. §§ 112(a), (b) (3–5), 112 note, 112(h).

Our question narrows down to a construction of section 112 of the Revenue Act of 1928 and, more particularly, the application of sub-sections (i) and (j) which define the terms "reorganization" and "control" as there used.

It is, however, necessary to also read section 111, 26 U.S.C.A. § 111, which defines gains and losses, although there is no controversy about the construction of this section which imposes the tax liability and defines the permissible deductions therefrom. Section 112(a) imposes a tax upon the gain or loss from the "sale or exchange" of property. If here the section stopped, there would be no question of petitioner's liability. Its subsidiary transferred securities and received others of a market value in excess of the cost price of the securities transferred. The use of the word "exchange" in the expression "sale or exchange" eliminates any successful contention that there was no gain, although the securities received were of a market value equal to the securities exchanged.

Section 112 provides, however, for an exception which reads: "except as hereinafter provided in this section."

In other words, the gains are taxable except as section 112 otherwise provides. Undoubtedly, Congress could have exempted all such "sales and exchanges," and it could have eliminated the exception provisions entirely. It saw fit to impose a tax upon all exchanges not within the exceptions. The taxpayer is therefore under the obligation of bringing its facts within the exception. Inasmuch as there is no dispute about the determinative facts, the burden of proof is a matter of no importance.

The exceptions are limited to reorganizations which are specifically defined.

Do the facts of this case disclose a "reorganization"?

As Congress could exempt or refuse to exempt profits or gains arising out of reorganizations, it could, of course, also define the term "reorganization" regardless of that word's common and accepted meaning in the economic, legal, or business world.

It is only the "reorganizations" which Congress defines which afford the basis of exemption from the income tax levy. What is said about reorganizations applies to the term "control." Congress not only could exempt gains from reorganizations, but it could and did define the

kind of such reorganization it wished to exempt, and if or when such reorganizations depended upon control of a new or other corporation, it could and did define the kind and extent of the control which it had in mind.

■ Whether the taxpayer has brought itself within the legislative concept of a reorganization depends upon the facts in each case.

As there is dispute as to the legal effect of the undisputed facts and the soundness of the Board's findings and conclusions, it becomes necessary to state the evidence with particularity.

The transactions which resulted in exchanges of securities had to do with three large holding companies, known here as United, Koppers, and American, which are our abbreviations for United Light and Power Company, Koppers Company, and American Light and Traction Company, respectively.

These companies held stock in and dominated subsidiary companies and also, to a degree, held stocks of companies which they did not own or control. The holdings of blocks of stock in the same company by two or all of the three companies or their subsidiaries led to the identity of corporate officers and boards. In the course of time the interests of two of said companies conflicted, and the differences of opinion became heated and hurtful. Whether it was pride of opinion, welfare of the public, the best interests of the subsidiaries, that led to an irreconcilable conflict between Koppers and American, we need not determine, for, as we view it, the motive is not important. Honesty in differences of opinion, we will assume. The significant fact is that an impasse was reached whereby Koppers' policy of buying producing coke plants and holding a large stock interest in the utility selling the gas to the public was thwarted, notably in the case of Brooklyn Union Gas Company.

At this stage when the fight for control of policies bid fair to become a draw, with the hands of all interested parties tied, a plan was submitted which might well be termed a compromise. It was finally adopted. United was to increase its stockholdings in, and in a certain respect, its control of American which consisted entirely of its voting stock. Koppers was to surrender its stock interest in American.

Atlantic Seaboard properties were to be controlled by Koppers. Middle west properties were to be controlled by American. The word "control" is here used in its broad, non-legalistic sense. Brooklyn Borough and Brooklyn Union stock were to go to Koppers' interests. Koppers was to transfer Milwaukee Coke and Gas to American. To obtain the necessary financing and comply with the New York laws respecting percentage of ownership of stock in New York utilities, it was necessary to organize numerous new corporations. Stock of these companies was to be held by one of the parties or their subsidiaries or by individuals who held the same in trust for Koppers.

The plan reached the written agreement state, July 6, 1928, when the contracts were signed. The transfers occurred within thirty days and most of them occurred on July 25 and July 27.

Generally speaking the objectives were simple, but detailed were the steps taken to consummate the plan.

"(a) Railways was to transfer 75,000 shares of Detroit Edison common, owned by it, to the American group in exchange for 75,000 shares of American common stock.

"(b) Railways was to transfer its equitable interest in 39,582 shares of Brooklyn Borough Gas Company common to the American group in exchange for 56,248 shares of American common. The Koppers interests were then to acquire control of the Brooklyn Borough stock from the American group."

To effectuate these plans, the written agreements called for the organization of subsidiary companies which should acquire and hold the Brooklyn Borough and Detroit Edison stock. The Dexter Company was organized in order to comply with American's policy of holding its investments in wholly owned subsidiaries. The stock of Brooklyn Borough Gas was transferred to 10 N. J. corporations which were formed for the same reason, and for the same purpose, and also for the additional purpose of complying with the New York law which prohibited acquisition by any corporation of more than 10% of the stock of any gas utility operating under the laws of that state.

Railways, on July 25, 1928, transferred to Dexter Company (organized July 3, 1928) 75,000 shares of common stock of the Detroit Edison Company in exchange

for the entire capital stock of Dexter Company. On the same day it transferred all the Dexter Company stock to American in exchange for 75,000 shares of American common stock. The fair market value of American stock was $15,000,000. On the same day Railways also transferred its interest in 39,582 shares of Brooklyn Borough Gas stock in equal proportions to 10 N. J. companies, which had just been incorporated and were known as the A-J N. J. companies. Railways received all the stock of said 10 A-J N. J. companies in exchange for the Brooklyn Borough stock so transferred. On the same day Railways transferred all the stock of the 10 A-J N. J. companies to American, in exchange for 56,248 shares of American stock. The fair market value of American stock was $11,249,600.

The 10 A-J N. J. companies which were then owned by American, on the second day thereafter, to-wit, July 27, transferred their assets consisting of 39,582 shares of the common stock of Brooklyn Borough to 10 Delaware corporations which were owned by five individuals who were owners of the stock of Koppers.

The 10 Delaware Companies in exchange for the assets so transferred delivered to the 10 A-J N. J. companies their 20 year 5½% gold debentures in a total amount of $11,249,600, the payment of which was secured by the pledge as collateral of the Brooklyn Borough stock.

Koppers also guaranteed the debentures both as to principal and interest. The 4 N. J. companies, the stock of which was owned by American, on the same day transferred their assets, consisting of 153,200 shares of common stock and certain debentures of the Brooklyn Union Gas Company, to 4 Delaware companies owned by the five individuals who owned directly or indirectly the stock of Koppers. In consideration therefor the four N. J. companies received some $21,321,900 of gold debentures guaranteed by Koppers and secured by a pledge of the securities.

Between July 6–27 Koppers Gas transferred to American all the stock of the Milwaukee Coke and Gas Company in exchange for 38,272 of American common stock.

Koppers Gas then owned 139,716 shares of common stock and 19,399 shares of preferred stock of American. On the last-named date Koppers Gas transferred all this American common stock and the 19,399 shares of preferred stock in American to a newly organized Delaware corporation, to-wit, the United American corporation, in exchange for all the latter's capital stock and $26,872,970 of its 20 year 5½% gold debentures secured by the American stock transferred. Koppers Gas on the same day transferred all the United American stock to United in exchange for 150,000 shares of class A common stock of United and an option to acquire an additional block of 180,000 shares of the same stock. The $26,872,970 of United American debentures transferred to Koppers Gas were guaranteed as to principal and interest by Railways. United transferred all the stock of United American Company to Railways, shortly after July 27, 1928, and received in exchange therefor, 32,500 shares of Railways common stock.

The Board found the transfer of American's stock to Railways through the medium of United American company and Railways' guarantee of United American's debentures were essential to the completion of the transaction. Railways could not transfer its own stock to Koppers Gas in exchange for American's stock without United's losing its 100% control of Railways which it was not willing to do, nor could Railways issue debentures entirely secured by American stock to Koppers, for Railways at that time had outstanding an issue of unsecured debentures in the amount of $25,000,000 which contained provisions prohibiting the issuance of any *secured* debentures.

The Board also found that the value of the property transferred in each of the transactions was equivalent to the value of the property received in exchange therefor; that each transaction was dependent upon the completion of the other transactions; that no one of the transactions would have been agreed to and concluded without a concurrent agreement for, and the conclusion of, the others. It also found that after the above-named transactions were completed, Railways owned or controlled over 50% but not more than 52% of the voting stock of American.

*Chronological Statement of Transfers and Contracts, etc.*

July 3, 1928 Dexter Company organized
July 6, 1928 Most of Contracts for reorganization made on this day.
July 11, 1928 10 N. J. corporations organized

July 25, 1928 — Railways conveyed to Dexter 75,000 Detroit Edison common stock in exchange for all Dexter stock.

" — Railways conveyed the Dexter stock to American for 75,000 shares common stock

" — Railways conveyed to 10 N. J. Cos. 39,582 shares, Brooklyn Borough, for all N. J. Cos.' stock.

" — Railways conveyed all 10 N. J. stock to American for 56,248 shares American common

July 27, 1928 — 10 N. J. Cos. conveyed 39,582 Brooklyn stock to 10 Del. Cos. owned by five persons owning Koppers, parent co.

" — 4 N. J. Cos. conveyed 153,200 shares Brooklyn Union common to four Del. Cos. owned by five persons owning Koppers, parent co.

Between July 7-27 — Koppers Gas conveyed to American all stock in Mil. Gas in exchange for 38,272 American common, which made Kopper's holding in American, 139,716 shares

On or about July 27 — Koppers Gas transferred 139,716 *Amer.* common to a new corp. *United American* for all United Amer. stock, and debentures

" — Koppers Gas transferred to *United* all United Amer. stock in exchange for 150,000 shares Class A. common of United

Shortly after July 27 — United transferred to Railways all stock of *United American* and received 32,500 shares of Rys. common. By this transaction, the Board concluded that Railways "*owned or controlled*" over 50% and not more than 52% of voting stock of American.

"The exchanges of securities in which Railways participated were conceived and consummated wholly as a part of the readjustment of the affairs of related corporations. They were undertaken for the purpose of solving problems of management * * *. To accomplish these primary objectives, several readjustments by way of merger of properties and exchange of securities were essential. Each merger was itself governed both in form and content by special requirements of corporate policy and state law. * * *

"* * * The reorganizations involving the Detroit Edison and Brooklyn Borough stock were necessary if the group merger of interests was to be accomplished. * * * In the manner typical of merger or consolidation, new corporations had to be formed * * * (they) were real.

"* * * There were compelling business reasons for separating these transactions * * *. It seems unquestionable, therefore, that the tax results should be determined on that basis. In the instant case, the ownership by Railways of the stock of the new companies was essential before Railways could make any exchange with American. If what the Board Member would classify as an 'independent' step had not occurred, none of the transactions could have occurred. * * *

"When business necessity dictates the

On the question of the existence of *two* parallel reorganizations, instead of an integral plan, petitioner states its position as follows:

'form' of transactions, the tax results are to be determined by what the parties actually do, * * *. Fundamental to an analysis of the separability of transactions

under the Revenue Acts is the test of business purpose. * * * the clear intent of the Revenue Act is that it (is) * * * to be applied to what actually took place and to what the parties intended to and did accomplish. * * * Relinquishment of control of another corporation secured through an exchange of securities, even if occurring immediately after such exchange, does not destroy reorganization character of the exchange. * * * Nor is there any significance in the fact that the two separate transactions took place on the same day * * * the first transfer created an ownership which alone made the second transfer possible. That there should be separate transactions was of the essence of the agreement. The exchange whereby Railways transferred 75,-000 shares of Detroit Edison Company stock to Dexter Company and acquired all of the stock of the Dexter Company constituted, we contend, a reorganization as defined in Section 112(i) (1) (B) of the Revenue Act of 1928. This is because Railways transferred a part of its assets to Dexter, and immediately thereafter was in control (owned 80 per cent or more) of Dexter stock. The exchange between Railways and American constituted a reorganization as defined in Section 112(i) (1) (A) of the Revenue Act of 1928, in that American acquired a majority (here all) of the stock of Dexter Company by way of exchange for its own stock."

Respondent states his position as follows:

" * * * Under well-established principles what is essentially a single transaction may not be split up into its component parts to avoid a tax. * * * The single transaction rule is plainly applicable in the circumstances here * * *. The two transfers, or series of transfers, here between Railways and American were three-way exchanges, pursuant to a single plan, and not distinguishable in fact or in principle from the decisions of the Supreme Court. These decisions are controlling * * * and compel the conclusion that the stock of American in the hands of Railways does not furnish the requisite continuity of interest under the rule, since the transferred assets of Railways went to American's subsidiaries rather than to the parent corporation. Railways in exchange for a part of its assets received stock of the parent corporation (American) only."

We are convinced that there was but one comprehensive transaction, although in making it effective, numerous proceedings or steps were necessary.[1] To avoid the large amount of cash payment which it would have been necessary to make, new corporations were formed, whose debentures were given in lieu of cash, secured by a pledge of the securities transferred to them. The laws of New York respecting the amount which one company might hold in gas, or other utilities (10% maximum by one corporation)—the existing outstanding debentures of Railways which were unsecured and provided against the creation of new secured debentures having a priority thereover—added to the difficulties of the contemplated plan, and necessitated the numerous and involved proceedings which were taken. Also the policy of American to hold its investments in wholly owned subsidiaries was another factor which made for complexity of facts.

While the finding of the Board on this question was somewhat in the nature of a conclusion and therefore less invulnerable than if it had covered a strictly controverted issue of fact, we are convinced that it reached the correct conclusion when it said:

"The ownership of the Dexter stock by Railways was transitory and incident to a plan which required its immediate transfer. That transfer was not an independent transaction but was an essential part of the plan. This circumstance distinguishes the present case from some others cited by the petitioner in which there was control immediately after the integral plan had been completed, but that control was then dissipated by a separate subsequent contract and transfer. Control is determined as of the completion of the integral plan. Railways did not have control of Dexter when the interdependent transfers were completed, since it did not own a share of Dexter stock. Nor did it control American. The transfer of property (Detroit Edison Co. stock) by Railways

---

[1] Single transaction: Helvering v. Bashford, 302 U.S. 454, 58 S.Ct. 307, 82 L.Ed. 367; West Texas Refining & Development Co. v. Commissioner, 10 Cir., 68 F. 2d 77; Weicker v. Howbert, 10 Cir., 103 F.2d 105, March 27, 1939; Helvering v. Elkhorn Coal Co., 4 Cir., 95 F.2d 732; Starr v. Com'r, 4 Cir., 82 F.2d 964; First Seattle Dexter Horton Nat. Bank v. Com'r, 9 Cir., 77 F.2d 45.

to the American group must be viewed as a whole. 'For income tax purposes the component steps of a single transaction can not be treated separately.' * * * Railways parted with some of its property and came out with some American stock, while American received all of the stock of Dexter and Dexter received the property, American received none of the property originally owned by Railways. * * * Railways did not maintain a sufficient continuity of interest in the property * * *. Railways and American did not merge or consolidate. Neither acquired a majority of the voting stock or substantially all the assets of the other.

Two recent Supreme Court cases, Groman v. Commissioner, 302 U.S. 82, 58 S. Ct. 108, 82 L.Ed. 63, and Helvering v. Bashford, 302 U.S. 454, 58 S.Ct. 307, 82 L.Ed. 367, furnish the asserted support for respondent's position, and afford the tests we must apply to determine whether, first, there was a reorganization, such as the statute specified, and second, there were one, or two, parallel reorganizations. Although each reorganization case involves variants in fact situations, there are underlying principles and statements of the law of sufficient analogy to provide assistance in the determination of each new case.

The Groman case (which was ours for decision before it reached the Supreme Court, 7 Cir., 86 F.2d 670) involved the transfer by the old company (Indiana Company) of its assets to the new company (Ohio Company) in exchange for the new company's stock, which was thereupon transferred to a third company, for a majority of the third company's stock. The inquiry was,—"Was the third company a 'party to a reorganization' so that receipt of its stock would not be 'other property'" and taxable to the one receiving it. The Court said [302 U.S. 82, 58 S. Ct. 111, 82 L.Ed. 63]:

"The petitioner contends, we think correctly, that the section * * * is intended to enlarge the connotation of the term 'a party to a reorganization'. * * * But the crucial question is whether Glidden was a party to the reorganization thus effected. Glidden received nothing from the shareholders of Indiana. The exchange was between Indiana's shareholders and Ohio. * * * Glidden was, in the transaction in question, no more than the efficient agent in bringing about a re-

organization. It was not, in the natural meaning of the term, a party to the reorganization.

"It is argued, however, that Ohio was the *alter ego* of Glidden; that in truth Glidden was the principal and Ohio its agent; that we should look at the realities of the situation, disregard the corporate entity of Ohio, and treat it as Glidden. But to do so would be to ignore the purpose of the reorganization sections of the statute, which, as we have said, is that where, pursuant to a plan, the interest of the stockholders of a corporation continues to be definitely represented in substantial measure in a new or different one, *then to the extent, but only to the extent, of that continuity of interest, the exchange is to be treated as one not giving rise to present gain or loss.* If cash or 'other property,' that is, property other than stock or securities of the reorganized corporations, is received, present gain or loss must be recognized. Was not Glidden's prior preference stock 'other property' in the sense that its ownership represented a participation in assets in which Ohio, and its shareholders through it, had no proprietorship? * * * These questions we think must be answered in the affirmative. To reject the plain meaning of the term 'party,' and to attribute that relation to Glidden, would be not only to disregard the letter but also to violate the spirit of the Revenue Act."

In the Bashford case, supra, Atlas Company sought to acquire three competitors (Peerless, Black Diamond, and Union Companies) without a direct purchase. To accomplish this end, it contracted with the stockholders of the three companies, who agreed to a transfer of the companies' stock and assets to a new corporation in exchange for common stock of the new company, and some stock of Atlas and cash furnished by Atlas. 57% of the common stock of the new company went to Atlas.

The court held that Atlas was not a party to the reorganization, although it acquired a majority interest in the new company, because a "continuity of interest" was lacking.

█ Bashford pointed out four differences between his, and the Groman case, but the Court found they were not sufficient to avoid the ruling in the latter case. The differences were: (1) Glidden did not acquire a majority of the shares of

the new company whereas Atlas did. (2) Atlas acquired as a part of the plan substantially all the shares of two of the old companies in direct exchanges with the taxpayer, in part consideration of which it gave some of its own stock. (3) Atlas, unlike Glidden, was a party to all the exchanges, while the new company was a party only to exchanges with Atlas. (4) The stockholders of Peerless and Union did not participate in the contract or exchange between Atlas and the new company. The Court reiterated the rule announced in the Groman case:

"Where, pursuant to a plan, the interest of the stockholders of a corporation continues to be definitely represented in substantial measure in a new or different one, then to the extent, *but only to the extent,* of that continuity of interest, the exchange is to be treated as one not giving rise to present gain or loss." [302 U.S. 454, 58 S.Ct. 308, 82 L.Ed. 367.]

■ The factual differences between the Groman case and the instant case are—the former case (and many other reorganization cases) involved (1) exchanges between the old and the new companies, (2) a transfer from the new company to the third company, (3) followed by a transfer from the third company to the old company. In the instant case there was an exchange (1) between the old and new companies, (2) then an exchange between the *old* and the third company, without any direct transaction between the new company and the third company. Does the fact that the old company served as a conduit for a transfer of the new company's stock to the third company, instead of there being a direct transfer from the new company of its stock to the third company differentiate the facts sufficiently to make the rule announced by the Supreme Court inapplicable? We think not, because the intermediate transactions are to be disregarded, and the plan treated as an integral one, with the net results achieved as the fact situation to which the statutory rule is to be applied. We are supported in this determination by the holding in Helvering v. Bashford, 302 U.S. 454, 458, 58 S.Ct. 307, 309, 82 L.Ed. 367, where the Supreme Court held:

"Any direct ownership by Atlas of Peerless, Black Diamond, and Union [Companies] was transitory and without real substance; it was part of a plan which contemplated the immediate transfer of the stock or the assets or both of the three reorganized companies to the new Atlas subsidiary. Hence, under the rule stated, the above distinctions are not of legal significance. The difference in the degree of stock control by the parent company of its subsidiary and the difference in the method or means by which that control was secured are not material. The participation of Atlas in the reorganization of its competitors into a new company which became a subsidiary did not make Atlas 'a party to the reorganization.' The continuity of interest required by the rule is lacking."

■ Two recent decisions from the Third Circuit, decided since the instant case was argued, are to the same effect, namely that a corporation is not a party to a reorganization merely because it is an important instrumentality in bringing about the reorganization or because it transfers some of its stock in consummation of the reorganization.

One of the decisions, the Independent Oil Company case, Com'r v. First Nat. Bank of Altoona, 3 Cir., 104 F.2d 865, decided June 17, 1939, involved a transfer by the old company of 86% of its assets to the new company in exchange for all the latter's stock, 75% of which it thereupon transferred to the Vacuum Company, along with an option to purchase the remaining 25%, in exchange for 22,978 shares of Vacuum Company stock. The court held that Vacuum Company was not a party to the reorganization because the old company had not a continuity of a substantial interest, having but 25% interest in the company to which assets were conveyed and an indirect interest through holding in Vacuum, among whose assets were 75% of the new company's stock. The court said:

"It will be seen that Vacuum occupies substantially the same position in the case at bar as did Glidden in the Groman case, and that the old and new companies occupy the same relative positions as did Indiana and Ohio. The old company and its stockholders continued to be directly interested in the assets transferred only to the extent of 25% of the stock of the new company and while they continued to be *indirectly* interested in those assets through ownership of stock of Vacuum among whose assets was the remaining 75% of the stock of the new company, under the opinion in the Groman case, that is not a 'continued substantial interest'. The fact that Vacuum was active in bringing about

the reorganization between the old and the new companies does not alter the situation. * * * Consequently Vacuum was not a party to the reorganization."

In the other case, Hedden v. Commissioner, 3 Cir., 105 F.2d 311, decided June 20, Hedden transferred all its assets to two wholly owned subsidiaries of Bethlehem Company, in exchange for which Bethlehem conveyed to Hedden its bonds. The court held Bethlehem was not a party to the reorganization. The court stated:

"The taxable consideration in the Groman case moved from the parent corporation Glidden, and not directly from the *transferees*. Glidden was held not to be a party to the reorganization. In the instant case, the consideration moved from Bethlehem rather than from Union and Mc-Clintic, the transferees. In order not to be taxable the consideration must come from a party to the reorganization. Bethlehem was not such a party. Nor did Hedden by reason of its acquisition of the Bethlehem bonds receive a definite and material interest in the affairs of the transferee companies * * * representing a substantial part of the value of the assets transferred which is an essential element of a non-taxable transfer.

\* \* \* \* \* \*

"In the instant case after the transfer Union and McClintic had Hedden's assets but the latter no longer had an equivalent continuing interest in the assets, for what it obtained in exchange were not securities in Union and McClintic, but in Bethlehem,

a company whose corporate existence was separate and distinct from that of its subsidiaries. *The fact that Union and Mc-Clintic were wholly owned subsidiaries of Bethlehem is, as we have seen, immaterial since they were separate corporations with distinct assets and liabilities whose existence we are not authorized by the Revenue Act to ignore."*

 Another ground for denying reorganization exists. If a corporation purchases a majority interest of stock or assets, for cash, there is no statutory reorganization.[2] The courts have construed the subsection to require, as indispensable to a statutory reorganization, a "continuity of interest" between the transferor and transferee before a reorganization is found to exist.[3] Here, Railways received the stock of a third company, whose wholly owned subsidiaries held the assets conveyed by Railways. Again it would be necessary to disregard corporate entities to hold that the transferor and transferee exchanged stock for assets. And it has generally been held that the receipt of stock from a third corporation, which did not receive the assets transferred, does not constitute a reorganization.[4]

 Our conclusions are:

(1) Railways did not participate in "a *merger or consolidation* (including the acquisition by *one corporation* of at least a majority of the voting stock * * * of another corporation" because it *and* its subsidiary, the United American, *together*

---

[2] Acquisition of majority stock or assets merely for cash (or certain other interests, not securities) does not constitute a reorganization. Pinellas Ice & Cold Storage Co. v. Com'r, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428; Cortland Specialty Co. v. Com'r, 2 Cir., 60 F.2d 937; Scofield v. LeTulle, 5 Cir., 103 F.2d 20, April 3, 1939; Helvering v. Minn. Tea, 296 U.S. 378, 385, 56 S.Ct. 269, 80 L. Ed. 284; Nelson Co. v. Helvering, 296 U.S. 374, 377, 56 S.Ct. 273, 80 L.Ed. 821; Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 F.2d 309.

[3] Continuity of interest must exist in order for there to be a reorganization. Helvering v. Bashford, 302 U.S. 454, 458, 58 S.Ct. 307, 82 L.Ed. 367; Groman v. Com'r, 302 U.S. 82, 58 S.Ct. 108, 82 L.Ed. 63; Hedden v. Com'r, 3 Cir., 105 F.2d 311, decided June 20, 1939; Com'r v. First Nat. Bank of Altoona, 3 Cir., 104 F.2d 865, decided June 17, 1939; Davis v. U. S., Ct.Cl., 26 F.Supp. 1007,

decided April 3, 1939; Nelson Co. v. Helvering, 296 U.S. 374, 56 S.Ct. 273, 80 L.Ed. 821; Helvering v. Minnesota Tea, 296 U.S. 378, 385, 56 S.Ct. 269, 80 L.Ed. 284; Cortland Spec. Co. v. Com'r, 2 Cir., 60 F.2d 937; Mead Co. v. Com'r, 4 Cir., 72 F.2d 22; Union Trust Co. v. Heiner, D.C., 18 F.Supp. 801; Worcester Salt Co. v. Com'r, 2 Cir., 75 F.2d 251; Miller v. Com'r, 6 Cir., 84 F.2d 415; G. & K. Mfg. Co. v. Helvering, 296 U.S. 389, 56 S.Ct. 276, 80 L.Ed. 291; Bus & Transport Co. v. Helvering, 296 U.S. 391, 56 S.Ct. 277, 80 L.Ed. 292; Helvering v. Winston Bros. Co., 8 Cir., 76 F.2d 381.

[4] Third corporation giving its own stock, not party to reorganization: Groman v. Com'r, 302 U.S. 82, 58 S.Ct. 108, 82 L. Ed. 63; Helvering v. Bashford, 302 U.S. 454, 58 S.Ct. 307, 82 L.Ed. 367; Hedden v. Com'r, 3 Cir., 105 F.2d 311, decided June 20, 1939; Davis v. U. S., Ct.Cl., 26 F.Supp. 1007,. decided April 3, 1939.

owned or controlled between 50 and 52% of American's stock. (Railways owned 264,252 shares, and United American owned 159,115 shares.) Outstanding were 834,520 shares. This fact precludes the application of the exception of Section 112(i) (1) (A), where it is required that the acquisition be by *one* corporation.[5] While not free from doubt we hold that the stock held by a subsidiary, or another corporation, can not be added to the stock held by the party claiming to be a party to a reorganization, in order to make up the necessary percentage to establish ownership or control. We may not disregard corporate entities in the determination of this, or other tax problems. Hedden v. Commissioner, 3 Cir., 105 F.2d 311, decided June 20, 1939. See also, Burnet v. Commonwealth Imp. Co., 287 U.S. 415, 419, 53 S.Ct. 198, 77 L. Ed. 399, and cases there cited; Commissioner v. Trustee of L. Inv. Co., 7 Cir., 100 F.2d 18.

(2) No reorganization under subsection (A) is shown, for the further reason that a mere acquisition of a majority interest in another corporation, without a continuity of interest in the transferee, is not sufficient to constitute a reorganization. The phrase "acquisition by one corporation of at least a majority of the voting stock" must be read in connection with the term "merger or consolidation." Law of Federal Income Taxation, Paul and Mertens, Sec. 17.75; Gregory v. Helvering, 293 U.S. 465, 469, 55 S. Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355.

The order of the Board of Tax Appeals is affirmed.

**CENTRAL NAT. BANK OF CLEVELAND v. GENERAL AMERICAN LIFE INS. CO.**

**No. 7826.**

Circuit Court of Appeals, Sixth Circuit.

May 10, 1939.

Marvin Harrison, of Cleveland, Ohio (Harrison & Marshman, of Cleveland, Ohio, on the brief), for appellant.

[5] Rogers v. Strong, 3 Cir., 72 F.2d 455. Paul and Mertens, Law of Federal Income Taxation, Sec. 17.75, "It would seem that the 'acquisition' referred to in

Robert H. Jamison, of Cleveland, Ohio (Robert H. Jamison and Robert F. Lee, both of Cleveland, Ohio, on the brief), for appellee.

Before ALLEN, HAMILTON, and ARANT, Circuit Judges.

the statute is 'direct acquisition' of the stock, and not an indirect acquisition; that is, there would be no acquisition of N. stock by the acquisition of the stock of M which owns all the stock of N."