**TENNESSEE, ALABAMA & GEORGIA RY. CO. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 11220.

United States Court of Appeals
Sixth Circuit.

March 14, 1951.

Wilmurt B. Linker, New York City, Claude A. Hope, Wilmurt B. Linker, and James C. Mulligan, all of New York City, on brief; Delafield, Marsh & Hope, New York City, of counsel, for petitioner.

Carlton Fox, Washington, D. C., Theron Lamar Caudle, Ellis N. Slack, and Carlton Fox, all of Washington, D. C., on brief, for respondent.

Before HICKS, Chief Judge, and SIMONS and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

This tax review involving complicated transactions and the applicability or inapplicability of numerous sections and subsections of the Internal Revenue Code analyzes to a single issue: Did the United States Tax Court, in determining the equity invested capital of a newly organized railroad corporation for excess profits tax purposes, correctly hold that a series of transactions leading to its set-up constituted integrated steps and parts of a single overall plan?

The Tax Court, in its findings of fact and opinion (reviewed by the Court) published in 13 T.C. 486 (Case No. 65), has adequately dealt with the pertinent sections of the Internal Revenue Code and rejected those deemed inapplicable. It would serve no useful purpose to repeat the discussion of these various Revenue Acts, properly considered and commented upon by the Tax Court in the appropriate exercise of its function. We merely cite them all in a marginal note.[1] Going into detail as to the revenue acts would merely tend to confuse a clear-cut issue which the Tax Court has fully developed. The reported adjudications of that tribunal are accessible to attorneys, accountants and others interested in tax litigation.

Deficiencies in excess profits tax of the Tennessee, Alabama & Georgia Railway Company were determined for the years 1940 and 1941, and the taxpayer brings the case to us for review. The petitioner was organized as a Delaware corporation on August 31, 1937, and owns and operates a short line railroad between Chattanooga, Tennessee, and Gadsden, Alabama. Through a series of transactions it acquired its railroad properties, formerly owned by a Georgia corporation of the same name. The older corporation had been organized by a promoter who acquired the railroad property at a receivership sale in 1922, and became owner of all its capital stock. This promoter from time to time had made loans to the Georgia corporation until it was indebted to him in a large amount.

In March, 1929, another promoter Coverdale, purchased for $400,000 all the capital stock and the open account indebtedness of the Georgia railroad corporation from persons who had acquired the interests of the original promoter. Thereupon, Coverdale organized a syndicate which purchased from him, for $400,000, the capital stock and open account indebtedness of the railroad company, the properties of which were in a rundown condition. This syndicate from time to time made open account loans to the Georgia Corporation to rehabilitate its railroad properties.

The transactions of this syndicate in the latter part of 1937 are those with which we are concerned. By November 8, 1937, the Georgia corporation owed the syndicate on open account $1,832,026.52, inclusive of both principal and interest. At that time, the capital deficit of the corporation was around $400,000.

On August 31, 1937, the syndicate caused the petitioner corporation to be organized under a Delaware charter with authorized capital stock of $750,000, divided into 150,000 shares having par value of $5.00 each. A reorganization plan was promulgated to its members by the managers of the syndicate on September 28, 1937, and was accepted by the Delaware corporation on the same date. The general plan of this re-

---

1. Sections 718 and 719, 750 and 751, 112, 712, 713 and 714, Internal Revenue Code,

26 U.S.C.A. §§ 718, 719, 750, 751, 112, 712–714.

organization was as follows: The syndicate would transfer all its assets to the Delaware corporation in exchange for which the petitioner would issue to the syndicate $1,027,000 of first lien, twenty-year, four percent, sinking fund bonds; would issue to the syndicate 102,700 shares of its capital stock; would also issue to the syndicate rights within thirty days from the date of their issue to subscribe for 15,405 additional shares at $5.00 per share in cash; and would assume all expenses of the reorganization of the corporation and of the formulation and consummation of the plan.

The syndicate, as sole stockholder of the Georgia railroad corporation, would either gratuitously forgive and cancel the open account indebtedness of the company as a contribution to its capital, or would transfer such indebtedness to the Delaware corporation which, under a trust indenture, would pledge as collateral for its bonds either the capital stock of the Georgia corporation, if the indebtedness had been canceled, or the indebtedness, if it had been transferred to the petitioner. The syndicate managers would exchange the bonds, stock and stock subscription rights of the Delaware corporation with the members of the syndicate for the surrender of their participation certificates; whereupon the same would be canceled and the syndicate terminated.

Application for permission to issue its securities in accordance with the plan was made forthwith by petitioner to the Interstate Commerce Commission, which granted the application by order of November 4, 1937.

The syndicate gratuitously forgave and canceled the entire open account indebtedness of the Georgia corporation in the amount of $1,832,026.52 as a contribution to the capital of the Georgia corporation on November 8, 1937, in pursuance of the plan. The Georgia corporation adjusted its accounts on the following day to reflect the transaction with the approval of the Interstate Commerce Commission.

On November 9, 1937, the syndicate transferred all its assets to the Delaware corporation, petitioner herein, in exchange for its bonds, stocks and stock subscription rights. These assets consisted of 2,000 shares, being all the capital stock of the Georgia corporation; $3,472.18 in free cash; $15,072.13 in cash under an escrow agreement requiring petitioner to use as much thereof as necessary for the payment in 1938 of the 1937 capital stock and income taxes payable by the syndicate on the theory as then claimed by the Bureau of Internal Revenue that it was an association taxable as a corporation; and claims for refund of corporate income tax and capital stock tax paid or to be paid by or on behalf of the syndicate. In June, 1941, the United States District Court for Southern New York held that the syndicate was not an association taxable as a corporation. As a result of this decision and a settlement obtained while an appeal was pending, the petitioner received in 1942 tax refunds amounting to $25,514.68, plus interest.

Soon after the transfer to the petitioner of the assets of the syndicate, the bonds, stocks and stock subscription rights of the petitioner corporation were distributed pro-rata among the members of the syndicate which was terminated, dissolved and liquidated on November 24, 1937. The syndicate members exercised their rights to subscribe for 15,220 shares of the total 15,405 shares of the stock of the petitioner offered, and paid $76,100 cash, or $5.00 per share therefor.

Within a week after the transfer of the assets of the syndicate, the petitioner railroad company promulgated a plan of liquidation of the Georgia railroad company which was approved and adopted by the latter on the following day. This plan provided in general that the Georgia corporation would, on December 31, 1937, transfer to the petitioner its unencumbered railroad property; would transfer to the petitioner its other properties subject to the payment of its liabilities; and would dissolve. Under the plan, the petitioner would surrender all the stock of the Georgia corporation for complete cancelation; would assume the liabilities of that corporation in excess of the assets subject to

the liabilities; and would substitute the railroad property as security for the bonds of the petitioner, changing their name to first mortgage, twenty-year, four percent, sinking fund bonds. By an order dated December 18, 1937, the Interstate Commerce Commission approved and authorized the plan, which was consummated on December 31, 1937.

The reasons and purposes for the liquidation of the Georgia corporation were stated by petitioner to be that, under the laws of Georgia, it was not permissible for the beneficial owners of a railroad to constitute a majority of its board of directors; that the elimination of a holding company would reduce overhead and other expenses, as well as the burden of taxation upon the enterprise; and would furnish a more direct security for the bonds of the petitioner which would have a sound capitalization consisting of a bonded indebtedness of $1,027,000 and capital stock aggregating in par value between $513,500 and $590,525, thus offering opportunity for the issuance of stock or notes if necessary to finance additions and betterments.

As previously indicated, we shall not repeat but merely refer to the Tax Court's opinion for its discussion of the various sections of the Internal Revenue Code which the contending parties respectively advanced or opposed as applicable. Our action, either in affirming the decision of the Tax Court or in reversing and remanding the cause with instructions to recompute the equity invested capital on the basis urged by petitioner, must be governed by our conclusion as to whether that portion of the opinion of the Tax Court now to be quoted was soundly and authoritatively reasoned.

In concluding, the Tax Court said: "Georgia distributed its assets to the petitioner in liquidation, and if that transaction were to be considered separately, perhaps section 718(a) (5) would apply. However, the Commissioner has contended that all of the various transactions which took place in the latter part of 1937 were related steps and but parts of a single plan. The plan was that the petitioner

would have the railroad properties, the Syndicate Members would surrender their Georgia stock and Georgia indebtedness and take the stock and bonds of the petitioner, and the Syndicate and Georgia would cease to exist.

"The evidence shows the chronology and details of the steps which were taken, but those facts do not prove that the various steps were not all a part of one plan. There is no other evidence to show that they were not all a part of one plan. Furthermore, the reasons and purposes advanced for the various steps rather indicate that all were a part of a single plan. The desirability of and the purposes stated for liquidating Georgia were all known before the first step was taken and some of the purposes stated for the first transfer, that is, the transfer of the Georgia stock by the Syndicate to the petitioner, were also well served by the complete elimination of Georgia.

"Transactions should be looked at as a whole and consideration given to substance rather than to form when the possible application of any of the non-recognition provisions of section 112(b) is in question. George Whittell & Co., 34 B.T.A. 1070; Frank Kell, 31 B.T.A. 212; Warner Company, 26 B.T.A. 1225; Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 F.2d 309; Diescher v. Commissioner of I. R., 3 Cir., 110 F.2d 90, affirming 36 B.T.A. 732, certiorari denied 310 U.S. 650, 60 S.Ct. 1099, 84 L. Ed. 1415; United Light & Power Co., 38 B.T.A. 477, affirmed 7 Cir., 105 F.2d 866, certiorari denied 308 U.S. 574, 60 S. Ct. 114, 84 L.Ed. 481. The liquidation should not be looked upon, for present purposes, as a separate transaction but must be considered as a part of the whole. The overall transaction does not come within section 112(b) (6), and the petitioner has shown no justification for the application of Section 718(a) (5) and is not entitled to include anything in its invested capital for the taxable years under that provision."

The Tax Court was justified in saying that the facts adduced did not show that the various steps disclosed by the evi-

dence were not all a part of one plan. See opinion of Judge Evan Evans in United Light & Power Co. v. Commissioner of Internal Revenue, 7 Cir., 105 F.2d 866, cited by the Tax Court, where it was held that a taxpayer who seeks to avoid payment of taxes on gain arising from the sale or exchange of property under a statutory exception must bring its facts within the exception upon which it relies. Section 112 of the Revenue Act was there involved.

In Commissioner of Internal Revenue v. Ashland Oil & Refining Co., 6 Cir., 99 F.2d 588, 591, Judge Simons spoke for this court: "It has been said too often to warrant citation that taxation is an intensely practical matter, and that the substance of the thing done and not the form it took must govern. This principle has been repeatedly invoked by the Commissioner and applied by the Board. Carter Publications, Inc. v. Commissioner, 28 B.T.A. 160; Warner Co. v. Commissioner [of I.R.], 26 B.T.A. 1225; George Whittell & Co., Inc. v. Commissioner [of I.R.], 34 B.T.A. 1070. And without regard to whether the result is imposition or relief from taxation, the courts have recognized that where the essential nature of a transaction. is the acquisition of property, it will be viewed as a whole, and closely related steps will not be separated either at the instance of the taxpayer or the taxing authority. Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 F.2d 309; Tulsa Tribune Co. v. Commissioner [of I.R.], 10 Cir., 58 F.2d 937, 940; Ahles Realty Corp. v. Commissioner [of I.R.], 2 Cir., 71 F.2d 150; Helvering v. Security Savings Bank, 4 Cir., 72 F.2d 874." See, also, the opinion of this court in Snowden v. McCabe, Collector of Internal Revenue, 6 Cir., 111 F.2d 743, 745, where it was held that all the steps in a plan of a taxpayer and his associates collectively constituted a single composite transaction within the intent of section 112(b) (5) of the Revenue Act.

For a succinct opinion grounded upon the well established proposition that substance and not form determines the applicability of a taxing act, see Labrot v. Burnet, Commissioner of Internal Revenue, 61 App.D.C. 47, 57 F.2d 413.

In Helvering v. New Haven & S. L. R. Co., Inc., 2 Cir., 121 F.2d 985, 988, it was held in relation to section 112(b) (5) of the Internal Revenue Act that for income tax purposes a transaction cannot be separated into its several steps and the last step treated as though it stood alone. Judge Learned Hand said: "As for the effort of the Commissioner to atomize the plan, as it were; i. e. to separate it into its several steps and treat the last as though it stood alone, it has been repeatedly repudiated. Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 F.2d 309; Bassick [Co.] v. Commissioner [of I.R.], 2 Cir., 85 F.2d 8; Helvering v. Elkhorn Coal Co., 4 Cir., 95 F.2d 732; Snowden v. McCabe, 6 Cir., 111 F.2d 743."

The following authorities cited by the petitioner do not support its position and would seem to require no discussion: Bruce v. Helvering, 64 App.D.C. 192, 76 F.2d 442 [involving two plainly separate and distinct transactions]; United States v. Cummins Distilleries Corp., 6 Cir., 166 F.2d 17 [decided on different principles]; and United States v. Cumberland Public Service Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 [accepting the ultimate findings of fact of the trial tribunal].

Main emphasis is placed by attorneys for the petitioner upon the decision of this court in National Bank of Commerce in Memphis v. United States, 6 Cir., 180 F.2d 356, certiorari denied, 1950, 340 U.S. 822, 71 S.Ct. 55, wherein we affirmed the judgment of the district court upon its findings of fact and conclusions of law, and for the reasons stated in its opinion reported in 87 F.Supp. 302, 304. Were that case not distinguishable, the petitioner should prevail.

The facts of the case were that, in January, 1933, the Bank of Commerce & Trust Company, a state institution, being in extreme financial difficulties, was reorganized into a new banking institution, National Bank of Commerce in Memphis. The $2,000,000 capital of the new bank was furnished by the old bank in exchange for all the capital stock of the new bank, except a few qualifying shares. Other features were involved than this mere ex-

change. The new bank was to take over certain assets belonging to the old and assume proportionately liability to its depositors; the trust accounts in the old bank were to be worked into the new insofar as possible; and the title and abstract business of the old bank were to be taken over by another newly organized corporation, for the reason that the new bank could not, under its federal charter, transact that character of business. In the end, the old bank was to be fully liquidated and each of its stockholders was to have stock in the new bank proportionately at such time as the stock could be exchanged. The stock in the new bank was hypothecated by the old bank as security for its loans. The plan of reorganization proved successful and the last of their stock in the new bank was received by the stockholders of the old bank in 1947.

A tax controversy arose from the transfer and conveyance on January 9, 1937, for a consideration of $950,000 in cash of the bank building and equipment of the old bank to the new. This money was used to reduce the indebtedness of the old bank. The contention of the new, or national bank, was that the transfer of the building and other physical properties was a step in a unitary plan of reorganization; wherefore, no loss from the exchange should have been recognized by reason of the provisions of section 112(b)(4) of the Internal Revenue Code, as modified by section 112(e) of Title 26, United States Code Annotated; and that the same result would follow by the application of section 112(b)(3) and (5), as modified by section 112(e) of Title 26 United States Code Annotated. The rejoinder of the United States was that the transfer of the property was a sale for cash, in consequence of which the appropriate basis of value for tax purposes was the cost of the property to the new bank as determined by the Commissioner. The position of the United States was sustained.

District Judge Darr viewed the evidence to establish that while persons in control of both banking institutions at the time the new bank was organized considered it desirable and advantageous that the new bank should acquire the building and equipment of the old, "the proposition was very indefinite and uncertain"; and some four years elapsed from the time the new bank was organized until the old bank transferred its building and equipment to the new institution which had become by then financially able to acquire the property. The opinion of the court emphasized that in 1933 there was no legally enforceable obligation on the part of the new bank to acquire the banking house and equipment of the old, that its acquisition was not necessary to the reorganization and was fraught with uncertainty and indefiniteness. The transfer in 1937, being a sale for cash, was held to be a transaction to be separately tested against statutory provisions, the cost price being the basis for tax purposes. It was pointed out that· the transaction was recorded in books and records as a sale and that the old bank, in its income tax return for 1937, reported a loss from the sale; and that both banks were under common control and the same controlling authority had reversed its position in tax litigation. The District Judge said: "The way of the taxpayer must square all the corners of the statute. He cannot take a short cut even though it be a righteous path to the same destination."

While there was a time lag of almost four years in the National Bank of Commerce case between the transfer of all the capital stock of the new bank to the old bank and the transfer of the bank building and equipment of the old bank to the new, here there was less than two months between the first step and the last in the transactions involved. Here, the separate steps were all binding when taken. There was no vagueness and uncertainty about the several steps in the integrated transaction, as was true in the National Bank of Commerce case where it was merely *desired and* contemplated that the new bank would eventually acquire the banking house of the old, if able to do so.

The overall plan contemplated and *consummated* in the present case was that the petitioner railroad corporation organized by the syndicate would own the railroad properties of the Georgia company, the

832

stock and indebtedness of which, owned by the members of the syndicate, would be surrendered and they would receive the stock and bonds of the petitioner; whereupon the existence of the syndicate and the Georgia corporation would terminate. The liquidation of the Georgia corporation was merely the final step in this overall plan for its reorganization into the railroad company chartered in Delaware. By reason of the essential differences indicated, the decision in the National Bank of Commerce case does not, in our judgment, support the petitioner's argument.

It is unnecessary that on a tax review all the facts to be considered be disclosed in the formal findings of the Tax Court, as petitioner seems to think. The opinion of that tribunal may be looked to for additional and even ultimate findings of fact. See Baker v. Commissioner of Internal Revenue, 6 Cir., 115 F.2d 987, 989; American Textile Woolen Co. v. Commissioner of Internal Revenue, 6 Cir., 68 F.2d 820, 824; Olson v. Commissioner of Internal Revenue, 7 Cir., 67 F.2d 726, 728. In the instant matter, therefore, we have taken into consideration not only the stipulated facts incorporated into the formal findings of the Tax Court, but have considered also the ultimate findings revealed in its opinion.

The minds of attorneys for the petitioner should be relieved of the thought that, in reaching the conclusion which we have, we are regarding our scope of review as limited by the doctrine of the Dobson v. Commissioner of I. R. case, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248; for, of course, we know that pursuant to statute, 26 U.S.C.A. § 1141(a), we now have jurisdiction to review a decision of the Tax Court in the same manner and to the same extent as we have to review a decision of a district court in a civil action tried without a jury. The findings of fact of the Tax Court, however, must not be set aside unless clearly erroneous. Civil Procedure Rule 52(a), 28 U.S.C.A. See Commissioner of Internal Revenue v. Brown Shoe Co., 8 Cir., 175 F.2d 305, 308 (C.A.8). We do not consider as authoritative and do not even cite cases presented in the brief of the Commissioner of Internal Revenue which rests upon an application of the doctrine of the Dobson case, which is no longer binding.

It should be understood that we regard the findings of the Tax Court not only as not clearly erroneous, but also as well supported by the evidence in this case.

The decision of the Tax Court is affirmed.