**MORGAN v. HELVERING, Com'r of Internal Revenue.**

No. 65.

Circuit Court of Appeals, Second Circuit.

Feb. 3, 1941.

Allen S. Hubbard, of New York City, for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Maurice J. Mahoney, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

· The taxpayer appeals from an order of the Board of Tax Appeals assessing an income tax deficiency against him because of gain "realized" through the exchange of shares in one company for those in another. This was the result of a devious and complicated set of transactions which concededly were all parts of a single plan, although their execution extended over a period of several months. The Board decided that upon no view had the taxpayer succeeded in bringing himself within those sections of the Revenue Act of 1932, which exclude the "recognition" of gain; and that is the only question on this appeal.

The taxpayer was the owner of one quarter of the shares of a corporation which for convenience we shall call the "Field Company," which had been engaged in two or more kinds of business, among them that of exporting grain. The rest of the shares were owned by the taxpayer's brother-in-law, Field, who had died just before the transactions in question. Field's executors did not want his estate to be kept in the grain business, and the taxpayer was willing to give up his shares in the company in exchange for the grain assets. The steps by which this purpose was realized were as follows. First, the "Field Company" transferred all the grain assets to a new corporation which we shall call "Morgan (1932)" in exchange for all its shares of stock. Second, the taxpayer conveyed his shares in the "Field Company" to another new corporation which we shall call "Monterey," in exchange for all its shares. Third, "Morgan (1932)" and "Monterey" merged to form a corporation which we shall call "Morgan (1933);" the taxpayer exchanged his shares of "Monterey" for an equal number of shares of this new company, and the "Field Company" did the same with its shares of "Morgan (1932)." The result was to vest both the grain assets and the taxpayer's former shares of the "Field Company" in "Morgan (1933)," whose only shareholders were the taxpayer and the "Field Company" each with 1000 shares. Fourth, "Morgan (1933)" transferred to the "Field Company" all of the

336

taxpayer's former shares in that company in exchange for all the "Field Company's" shares of "Morgan (1933)," leaving the taxpayer the sole shareholder of that company. Fifth, the "Field Company" retired its own shares so acquired from "Morgan (1933)" and formerly held by the taxpayer, so that Field's executors then became the only shareholders of the "Field Company," which had parted with the grain assets and nothing more. Sixth, "Morgan (1933)" reduced its capitalization by the number of its shares received from the "Field Company." The final result of all this was therefore that the "Field Company" had parted with the grain assets and had been enabled to cancel one quarter of its shares; and that the taxpayer had lost his shares in the "Field Company" and had become the sole shareholder of "Morgan (1933)" which had acquired the grain assets. The taxpayer argues that each step in this series was a nontaxable exchange under some part of § 112, 26 U.S.C.A.Int.Rev.Acts, page 511; he further argues that even though all the intermediate steps be disregarded on the theory that they were parts of a single plan, still from the result, considered by itself, no "recognizable" gain arose because the exchange was part of a "reorganization" under § 112 (i) (1) (B).

■■■ The Board found that "there was but a single plan and a single transaction * * * from the inception of the transaction to its conclusion there was never any intention to reorganize a corporate business. * * * It was never intended that Albert C. Field Inc. should hold the stock of the new corporation, except temporarily." We read these statements and other findings too long to quote as meaning that the parties—the taxpayer and Field's executors—made a contract whose performance involved the whole series of separate transactions detailed above, and from that it follows that each party, if he performed his part, could have compelled the other to perform his. The findings are not as explicit upon this point as we could have wished, but any doubts are to be taken against the petitioner. If all the steps were in performance of a pre-existing contract, the argument at once falls to the ground which would have us look at the several steps as though the transactions had been separate; because at the end of each intermediate step the parties had no title, free and clear, to any of the property transferred until the whole series was completed. When for example the "Field Company" got the shares of "Morgan (1932)" in exchange for the grain assets, it was not entitled to keep them; it was under a legal obligation first to return them to "Morgan (1933)" upon the merger, and later to return the shares in "Morgan (1933)" to that company for cancellation. Again, when the taxpayer transferred to "Monterey" his Field shares, they did not belong to that company; it in its turn was under an obligation to transfer them to "Morgan (1933)" and "Morgan (1933)" was obliged to transfer them to the "Field Company" for cancellation. The only property which ever passed, free and clear, was the grain assets to "Morgan (1933)," the Field shares to the "Field Company," and the shares of "Morgan (1933)" to the taxpayer; all other apparent titles were defeasible in equity. When § 112 of the Revenue Act of 1932 spoke of "exchanges," it did not mean such illusory exchanges which gave the parties no more than a title that they must disgorge; it contemplated enduring interests.

■■■ We must therefore consider the situation as it would have been had all the intermediate prestidigitation been omitted. The argument is that the transaction so viewed was a "reorganization" within § 112 (i) (1) (B), because it was a transfer of a part of a corporation's assets, after which the shareholders of the transferor were in control of the transferee. More specifically it is that the "Field Company" transferred the grain assets to "Morgan (1933)" in exchange for all its shares, which were issued to a shareholder of the "Field Company"—the taxpayer—and that this put the exchange within § 112 (i) (1) (B) because the transferee was in the control of one, though not all, of the transferor's shareholders. This implies that it is enough if control is in some, though not all of the transferor's shareholders; and if the taxpayer had remained a shareholder of the "Field Company," we will assume, arguendo, that the argument is correct. But he never did. As soon as the "Field Company" transferred the grain assets to "Morgan (1933)"—perhaps as soon as the original contract was concluded—he ceased in equity to be a shareholder of that company; he was legally bound to carry out the whole plan and that involved surrendering his Field shares for cancellation. It was not a question of the length of any interval

during which he remained a shareholder; he ceased to be one instanter, whatever his apparent legal title. Weicker v. Howbert, 10 Cir., 103 F.2d 105; Case v. Commissioner, 9 Cir., 103 F.2d 283. The transaction might indeed have taken another form in which the gain would possibly not have been his but that of "Morgan (1933)." He might have organized "Morgan (1933)" and transferred all his Field shares to it in exchange for its own shares; and that company might independently have later exchanged the Field shares for the grain assets. If this were really a separate transaction we will again assume for argument that the only taxable gain that would have emerged would have been that of "Morgan (1933)". That was not what took place. As we have seen, "Morgan (1933)" was never in a position to agree to an exchange of its Field shares for the grain assets; it never owned the Field shares; though registered in its name, the equitable title was already in the "Field Company." We cannot see that our decision in Helvering v. Schoellkopf, 2 Cir., 100 F.2d 415, is apposite. We there held that § 112 (i) (1) (B) applied to a situation in which the transfer was by a corporation which was in process of liquidation. One may argue that such a corporation ought not to be regarded as having shareholders at all, and perhaps that may be right, though apparently it was not argued. The answer depends upon how long one should treat the group at large as still shareholders; that is upon the duration of the corporate purposes. That is, however, altogether irrelevant to the case at bar in which ab initio the taxpayer severed all relations with the group, so that he could be no longer reckoned one of its members whatever their purposes. For these reasons we conclude that the exchange was a "partial distribution" under § 115 (c), 26 U.S.C.A. Int.Rev.Acts, page 521, and resulted in a taxable gain because it was not "a distribution within the provisions of section 112 (h) of stock * * * in connection with a reörganization."

■ The Board was right in refusing to pass upon the question whether "Morgan (1933)" realized a taxable gain—except in so far as that may follow from what we have just decided—and it was also right not to decide what was the "basis" for that gain, if any there was, or for any future gain if it sells the grain assets. These points are moot upon this record.

Order affirmed.