MAINE STEEL, INC.,

v.

UNITED STATES of America.

Civ. No. 5–50.

United States District Court
D. Maine, S. D.
June 23, 1959.

Vincent L. McKusick, Portland, Me., Carl J. Marold, Boston, Mass., Jotham D. Pierce, Portland Me., for plaintiff.

Peter Mills, U. S. Atty., Portland, Me., Rufus Stetson, Jr., Sp. Atty., Tax Division, Dept. of Justice, Washington, D. C., for defendant.

GIGNOUX, District Judge.

This is an action brought pursuant to the provisions of 28 U.S.C.A. § 1346(a)(1) to recover $299,803.02 of Federal excess profits taxes, with interest, paid by plaintiff for the fiscal year ended March 31, 1945. The net amount sought (after adjustment for related deficiencies in income taxes and declared value excess profits taxes) is some $274,700. The

Commissioner has tentatively conceded a net overpayment of such taxes of some $122,300, so that the amount at issue is approximately $152,000.

Since part of the claimed overpayment results from the carry back to the fiscal year ended March 31, 1945 of a net operating loss sustained by plaintiff in its fiscal year ended March 31, 1947, the amount of which is in issue, the amounts of plaintiff's net income, excess profits tax net income and excess profits tax credit for both years are involved. Except for the minor issues referred to below, the determination of these amounts turns principally upon the tax cost or basis of that portion of the assets sold by plaintiff in fiscal year 1947, comprising plaintiff's plant and equipment at South Portland, Maine, which plaintiff acquired from its predecessor, Maine Steel Products Co. (hereinafter called "Products"), on April 5, 1937 when plaintiff was organized. (These assets will be hereinafter called the "1937 Assets".)

Most of the facts were presented in a Stipulation of Facts, and the Court finds the facts as stipulated. Plaintiff also presented oral testimony at a hearing on April 7 and 8, 1958, relating chiefly to the transaction by which plaintiff acquired the 1937 Assets and the value of those Assets at the time of their acquisition.

At the Pre-Trial Conference, the parties agreed that the issues which this Court is called upon to determine are:

1. Determination of the basis of the 1937 Assets:

(a) Whether the transaction by which plaintiff acquired the 1937 Assets from Products was "tax free" under either Section 112(b)(4) or Section 112(b)(5) of the Internal Revenue Act of 1936, 49 Stat. 1679, 26 U.S.C.A. § 112(b)(4, 5), so that under Section 113(a)(7) or (8) of the 1939 Code, 26 U.S.C.A. (I.R.C.1939) § 113(a)(7), (8), plaintiff's basis of such Assets for the purpose of determining depreciation and gain or loss on their disposition and for computing its excess prof-

its tax credit would be fixed with reference to their basis in the hands of its predecessor.

(b) If it is determined that the transaction by which plaintiff acquired the 1937 Assets from Products was not tax free:

(i) what was the fair market value of the 1937 Assets at the time of their acquisition by plaintiff;

(ii) whether the aggregate amount of the money and property paid-in components used in determining the excess profits tax credit of plaintiff was $65,500 as determined by the Commissioner, or whether, as plaintiff contends, the aggregate of these components was the sum of $170,861.67 (the amount of the excess of all assets, other than the 1937 Assets, transferred to plaintiff over the liabilities assumed by plaintiff on April 5, 1937) plus the fair market value of the 1937 Assets as determined by the Court.

2. Whether the basis of other assets owned by plaintiff may be reduced to reflect depreciation which the Commissioner contends was improperly allowed in previous years, which are closed, with respect to the 1937 Assets.

3. Whether plaintiff was entitled to deduct in its fiscal year ended March 31, 1945 $12,500 which it paid during that year as Federal capital stock taxes for the capital stock tax year ended June 30, 1944 rather than $2,500 paid the following year for the capital stock tax year ended June 30, 1945.

4. Whether for the fiscal year ended March 31, 1947 plaintiff was entitled to a deduction of $6,225.25 for vacation pay to union employees under union contract, which amount had been accrued at the close of that fiscal year with respect to vacations in the following year.

5. Whether the Commissioner incorrectly determined that a loss sustained by plaintiff in the fiscal year ended March 31, 1947 on account of abandonment of a patent was $828.50 rather than $2,403.80.

6. Whether, in determining the amount of plaintiff's net income for the fiscal year ended March 31, 1945 and

plaintiff's unused excess profits tax credit for the fiscal year ended March 31, 1947 available as a carry back to the fiscal year ended March 31, 1945, the Commissioner erred in failing to give effect to the carry back of the net operating loss incurred in the fiscal year ended March 31, 1946, to the fiscal years ended March 31, 1944 and March 31, 1945.

(Defendant reserved the right to object to the determination of Issue No. 6, or any part thereof, on the grounds of variance, if any, from the claim for refund and any rights which it may have under the applicable statutes of limitations.)

The parties further stipulated that after the Court has determined the foregoing issues, the parties will, by agreement, if possible, submit computations pursuant to the Court's determination showing the correct amount of the net overpayment of excess profits taxes for the year 1945 to be entered as a judgment. It was also stipulated that if the parties are unable to agree as to the amount of such overpayment, either of them may file with the Court a computation of the amount believed to be in accordance with the decision and request that the Court determine the correct amount of such overpayment and enter its judgment accordingly.

Briefs have been filed by the parties, and oral argument was heard on March 23, 1959. The Court will now consider the stipulated issues in the order in which they are listed above.

### Issue No. 1—Basis of 1937 Assets

The principal amount at issue turns upon a determination of the proper tax basis of the 1937 Assets because such basis (a) determines the amount of gain or loss realized by plaintiff on the sale of the 1937 Assets in the fiscal year ended March 31, 1947, which in turn affects the amounts to be carried back to 1945; (b) governs the amount of the deduction for depreciation allowable with respect to the 1937 Assets from the time of acquisition, and particularly for the fiscal years ended March 31, 1945 and March 31,

1947; and (c) has a major effect upon the determination of plaintiff's excess profits tax credit with respect to both fiscal years ended March 31, 1945 and March 31, 1947.

The dispute over the proper tax basis of the 1937 Assets arises from the manner in which they were acquired by plaintiff from Products in 1937. Plaintiff has fixed the basis of such Assets with reference to their basis in the hands of Products, asserting that the transaction by which it acquired the Assets was tax free under either Section 112(b)(4) (exchange of property by one corporation in pursuance of a plan of reorganization solely for stock or securities in another corporation) or Section 112(b)(5) (a transfer to a corporation controlled by the transferor), with the result that Products' basis of such Assets was carried over to plaintiff under Section 113 (a)(7) or (8). Defendant contends that the transaction was not tax free, so that the basis of the 1937 Assets to plaintiff was their fair market value as of the time of acquisition, which the Commissioner has determined to be zero.

Plaintiff contends that defendant is in error in regarding the transaction by which it acquired the 1937 Assets as taxable and that the fair market value of the Assets at the time of acquisition therefore need not be determined. If it should be determined that the transaction in question was not tax free and that the basis of such Assets is to be fixed with reference to their fair market value, then plaintiff asserts, in the alternative, that the 1937 Assets had substantial value, and plaintiff has introduced testimony as to their value.

The essential facts relating to the acquisition can be summarized as follows: Plaintiff is a Maine corporation, which was organized on April 5, 1937 to take over the assets of Products, also a Maine corporation. Since 1928 Products had been engaged in the manufacture of marine hardware and snow plowing equipment at South Portland, Maine. On March 1, 1933 Products, in addition to amounts owed trade creditors, was in-

debted to Fidelity Trust Company of Portland, Maine, three other Maine banks, New England Public Service Company and New England Industries, Inc. in the total amount of some $425,800, plus interest. New England Industries, Inc., an industrial subsidiary of New England Public Service Company, owned all of the First Preferred Stock and a majority of the Common Stock of Products. Fidelity, which was the principal creditor of Products and the only secured creditor, had not reopened after the March, 1933 bank holiday, and Mr. Robert Braun had been appointed its Conservator on March 18, 1933. As of March 1, 1933, Products' indebtedness to Fidelity was in the principal amount of $252,000, of which $78,000 was secured by mortgage. This indebtedness was appraised in the Conservator's inventory at only $20,000.

Sometime in 1933, shortly after Mr. Braun's appointment as Conservator, Mr. George Soule, then President and General Manager of Products, approached Mr. Braun to ascertain whether a settlement could be made with Products' creditors which would permit the business to continue and permit Mr. Soule and five associates (all of whom were employees of Products, but none of whom were stockholders) to acquire an equity interest in the business. Informal negotiations between Mr. Braun and the Soule group continued from 1933 through 1936. Sometime prior to May, 1935 [1] a "gentlemen's agreement" had been worked out by which the Soule group were to be permitted to operate the business, and if a composition of the claims of the other bank creditors could be effected, they were to be allowed to acquire the business by the payment of $100,000, of which $50,000 was to be in the form of a note, with an appropriate adjustment for interest to the date of consummation. Relying on this tentative arrangement, the Soule group had taken substantial reductions in salary and had continued to operate the business. During this pe-

riod the fortunes of the business changed from losses of $103,000 in 1932 and $167,000 in 1933 to a small profit of $8,900 in 1937. The volume of business increased from some $200,000 in 1933 to about $770,000 in 1937.

There was substantial delay in consummating the tentative plan, principally because of difficulty in working out its mechanics and prolonged negotiations between Mr. Braun and the other bank creditors. The evidence is not clear as to when agreement was reached as to the precise details of the plan as it was finally developed, but the record shows that finally, on April 21, 1936 Mr. Braun, as Conservator, having worked out a composition with the other banks, petitioned for and received approval from the Supreme Judicial Court of Maine of a plan for the settlement of Products' affairs, which provided for the acquisition by the Conservator for $30,450 of the claims of the other bank creditors and New England Public Service Company, and for the payment by Products to Fidelity, for all its claims, including those acquired by the Conservator, of the sum of $112,000, of which not less than $20,000 would be in cash and the unpaid balance would be represented by notes secured by a mortgage of all Products' property and an assignment of all its stock. The application noted that it would "probably be necessary to organize a new company."

Following court approval, the stockholders of Products met on August 22, 1936 to take the necessary corporate action. By this time it had been decided to create a new corporation to carry out the plan. In the notice of the meeting the stockholders were advised that if the plan were adopted they would receive nothing of value for their stock, and none of them did receive anything. Because of dividend arrearages the entire voting privilege was in the First Preferred Stock, all of which was held by New England Industries, Inc., which was willing to vote in favor of the plan, even

---

1. There was no testimony presented as to the exact date upon which an understanding was reached between Mr. Braun and the Soule group.

though its own interest was thereby eliminated, in order to avoid the trouble and legal expense of liquidation. At the meeting, the stockholders adopted a plan of reorganization by which all of the assets were to be turned over to a new corporation in exchange for all its stock, a mortgage note of $50,000 and the assumption of all of the debts of Products other than those owing to Fidelity and New England Industries, Inc. The stock and mortgage note to be received by Products under this plan were to be transferred to Fidelity in full settlement of its claims against Products, and the Soule group was to be given the privilege of purchasing the stock from Fidelity.

The plan, as adopted by the stockholders, was formalized in a letter agreement dated December 19, 1936, signed by Mr. Soule, both as President of Products and individually, and by Mr. Braun as Conservator. The letter agreement contained a definite undertaking by the Conservator to sell the stock of the new corporation to the Soule group for $65,500, to be represented by a note or notes secured by a pledge of the stock.

Plaintiff was the new corporation organized pursuant to the plan, and on April 5, 1937 it acquired all of the assets of Products and assumed all of its liabilities, other than the claims held by Fidelity and by New England Industries, Inc., and issued to Products in exchange therefor all 3,000 shares of its Common Stock, which were turned over by Products to Fidelity. Instead of issuing the $50,000 mortgage note to Products, plaintiff issued it directly to Fidelity. The note was issued in the amount of $50,000, but the actual liability was only $40,000 because in the interim Products had paid $10,000 to Fidelity in reduction of its indebtedness, which was credited as a payment on the new note. Mr. Braun, as Conservator, then sold the 3,000 shares of

plaintiff's stock to Mr. Soule in return for Mr. Soule's note in the amount of $67,000, and Mr. Soule, in turn, transferred 1,449 of these shares to his associates at the same price per share.

The aggregate amount received by Fidelity for its claims, namely, the $67,000 for the stock, the mortgage note of $40,000 and the $10,000 previously paid by Products on account of its indebtedness, was thus $117,000. The additional $17,000 over the $100,000 originally contemplated represented interest for the time that had elapsed.

On September 6, 1946 plaintiff sold to Maine Specialty Co. the major portion of the land, buildings, machinery and equipment comprising its South Portland plant, which consisted in part of the 1937 Assets and in part of property purchased subsequent to April 5, 1937. In computing a loss of $62,634.32 sustained on that sale, plaintiff used as the adjusted basis of the 1937 Assets the sum of $112,652.44, which was fixed with reference to their adjusted basis of $260,228.40 in the hands of Products on April 5, 1937.[2] In computing a gain of $70,449.83 on the sale, the Commissioner determined that the 1937 Assets had an adjusted basis on April 5, 1937 of zero.

(a) *Was the Transaction By Which Plaintiff Acquired the 1937 Assets "Tax Free"?*

Plaintiff contends, first, that the transaction by which it acquired the 1937 Assets from Products qualified as a "tax free reorganization" under Section 112 (b) (4) of the Internal Revenue Act of 1936. That Section provided:

*"Gain of corporation.* No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corpo-

2. Similarly, in setting up its books on April 5, 1937, plaintiff entered the 1937 Assets at the same gross amounts and with the same depreciation reserves at which they had been carried on the books of Products, and from that date plaintiff continued to compute depreciation and basis for gain or loss on the 1937 Assets with reference to the cost of those Assets in the hands of Products.

ration a party to the reorganization."

For this purpose Section 112(g) (1) (B) of the 1936 Act, 49 Stat. 1681, as amended by the Internal Revenue Act of 1939, 53 Stat. 871, defined "reorganization" to include, among other things:

> "* * * the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded * * *."[3]

It seems clear that the transaction by which plaintiff acquired the 1937 Assets from Products came within the literal language of the Section 112(g) (1) (B) definition of a reorganization. The transaction involved the acquisition by plaintiff of not "substantially all", as required by the statute, but of "all" of Products' assets in exchange for all plaintiff's voting stock and the assumption of Products' liabilities to trade creditors and $40,000 of the $78,000 mortgage which Fidelity held on Products' assets. The issuance of the mortgage to Fidelity constituted the assumption of a portion of the old mortgage, and as such, under the express provisions of subsection (B), is to be disregarded insofar as determining whether the acquisition was "solely for * * * voting stock." Southland Ice Co., 1945, 5 T.C. 842 (acq.); New Jersey Mortgage & Title Co., 1944, 3 T.C. 1277 (acq.); Stoddard v. C. I. R., 1942, 47 B.T.A. 584,

affirmed 2 Cir., 1945, 152 F.2d 445; Harden F. Taylor, 43 B.T.A. 563, affirmed Helvering v. Taylor, 2 Cir., 1942, 128 F.2d 885; see: Seiberling Rubber Co. v. Commissioner, 6 Cir., 1948, 169 F.2d 595, 601.

Similarly, if the transaction was a reorganization within Section 112(g) (1) (B), there can be no question that it fitted the literal language of Section 112 (b) (4), since it follows that the transaction was one by which Products, a party to a reorganization, exchanged property, in pursuance of the plan of reorganization, solely for stock in plaintiff, a party to a reorganization. Defendant, however, challenges the tax free status of the transaction on the ground that the so-called "continuity of interest" requirement was not met.

The continuity of interest rule was introduced by the United States Supreme Court in Pinellas Ice & Cold Storage Co. v. Commissioner, 1933, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428. Since Pinellas, it has been judicially recognized that a transaction may not qualify as a tax free reorganization under the various revenue acts, even though the literal language of the statute is satisfied, unless the proprietary interest after the transaction rests in the same persons as immediately prior to the transaction. See, e. g., LeTulle v. Scofield, 1940, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355; Helvering v. Bashford, 1938, 302 U.S. 454, 58 S.Ct. 307, 82 L.Ed. 367; Groman v. Commissioner, 1937, 302 U.S. 82, 58 S.Ct. 108, 82 L.Ed. 63; G. & K. Manufacturing Co. v. Helvering, 1935, 296 U.S. 389, 56 S.Ct. 276, 80 L.Ed. 291; Helvering v. Watts, 1935, 296 U.S. 387, 56 S.Ct. 275, 80 L.Ed. 289; Helvering v. Minnesota

---

3. If the transaction by which the plaintiff acquired the 1937 Assets was a tax free reorganization, it follows, by virtue of Section 113(a). (7) of the 1939 Code, as in effect in 1945, that plaintiff's basis of the Assets would be the same as their basis in the hands of Products. That Section provided:

"*Transfers to corporation.* If the property was acquired—
* * * * * * *

"(B) in a taxable year beginning after December 31, 1935, by a corporation in connection with a reorganization,
then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. * * *"

Tea Co., 1935, 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284; John A. Nelson Co. v. Helvering, 1935, 296 U.S. 374, 56 S.Ct. 273, 80 L.Ed. 281. In Groman v. Commissioner, supra, the Supreme Court authoritatively stated the rule to be (302 U.S. at page 89, 58 S.Ct. 112):

" * * * that where, pursuant to a plan, the interest of the stockholders of a corporation continues to be definitely represented in substantial measure in a new or different one, then to the extent, *but only to the extent,* of that continuity of interest, the exchange *is* to be treated as one not giving rise to present gain or loss. * * * " (Emphasis supplied.)

And in Seiberling Rubber Co. v. Commissioner, 6 Cir., 1948, 169 F.2d 595, at page 597, the reason for the requirement was stated as follows:

"The purpose of the statutory non-recognition of gain or loss from reorganization transactions, as indicated by the legislative history, was in part to prevent losses being established by bondholders, as well as stockholders, who received the new securities *without substantially changing their original investment.* The legislative history confirms the Congressional intent to cover reorganizations where the taxpayer's money is still tied up in the same kind of property as that in which it was originally invested. * * * The reorganization provisions were enacted to free from the imposition of an income tax purely paper profits or losses where there is no realization of gain or loss in the business sense *but merely the recasting of the same interests in a different form,* the tax being postponed to a future date when a more tangible gain or loss is realized." (Emphasis supplied.)

See also: Cortland Specialty Co. v. Commissioner, 2 Cir., 1932, 60 F.2d 937, 940, certiorari denied, 1933, 288 U.S. 599, 53 S.Ct. 316, 77 L.Ed. 975.

Under the continuity of interest test, there was no tax free reorganization in this case since concededly the old stockholders of Products were entirely eliminated by the plan and received no proprietary interest in plaintiff.

■ To escape application of the continuity of interest rule, plaintiff argues that although Fidelity did not formally own the stock of Products prior to the reorganization, it was in reality the equity owner of Products because of Products' obvious insolvency. In support of this position plaintiff relies upon Helvering v. Alabama Asphaltic Limestone Co., 1942, 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775, and Palm Springs Holding Corp. v. Commissioner, 1942, 315 U.S. 185, 62 S.Ct. 544, 86 L.Ed. 785, in which the Supreme Court held that the continuity of interest test was satisfied and the requirements of a tax free reorganization met where all the assets of an insolvent corporation were transferred to a new corporation, which issued all of its stock to creditors of the insolvent corporation who had "stepped into the shoes of the old stockholders." Helvering v. Alabama Asphaltic Limestone Co., supra, 315 U.S. 184, 62 S.Ct. 543; cf. Helvering v. Cement Investors, Inc., 1942, 316 U.S. 527, 62 S.Ct. 1125, 86 L.Ed. 1649. But neither of these cases supports plaintiff's position with respect to this transaction, since in them the Court was concerned with situations in which the creditors by the institution of bankruptcy proceedings had taken "steps to enforce their demands against their insolvent debtor" and had "invoked the processes of the law to enforce their rights of full priority." Helvering v. Alabama Asphaltic Limestone Co., supra, 315 U.S. 183–184, 62 S.Ct. 543. As stated by the Court in Palm Springs Holding Corp., supra, 315 U.S. 188–189, 62 S.Ct. 546, "The critical facts are that the old corporation was insolvent and *that its creditors took steps to obtain effective command over its property.*" (Emphasis supplied.) Granting that Products was insolvent, Alcazar Hotel, Inc., 1943, 1 T.C. 872, 877–878, the cases relied on are of no assist-

ance to plaintiff here because Fidelity had not taken any affirmative steps "to obtain effective command over its property." A similar contention was rejected by the Court in Seiberling Rubber Co. v. Commissioner, supra, with the following comment (169 F.2d at page 601):

> "Simply because a corporation may be unable to pay its debts in the ordinary course of business, does not deprive the stockholders of their proprietary interest. If insolvency proceedings take place, then the stockholders' proprietary rights are terminated, and the creditors succeed to such rights and ownership of the corporate assets. If creditors of a corporation do not succeed to the proprietary interest of the stockholders without the institution of insolvency proceedings, the proprietary interest must remain in the stockholders until that eventuality."

However, even assuming plaintiff's contention in the foregoing regard was sound and that because of Products' advanced insolvency Fidelity might be regarded as having been the equitable owner of Products, an examination of the actualities of the transaction discloses clearly that any direct ownership by Fidelity of plaintiff's stock was transitory and without real substance, and that it was merely part of a plan which contemplated the immediate transfer of the stock to the Soule group. See Helvering v. Bashford, supra, 302 U.S. at page 458, 58 S.Ct. 307; United Light & Power Co. v. Commissioner, 7 Cir., 1939, 105 F.2d 866, 876, certiorari denied, 1939, 308 U.S. 574, 60 S.Ct. 114, 84 L.Ed. 481.

It is now axiomatic that in the field of taxation the substance and not the form of a transaction controls its tax consequences. Gregory v. Helvering, 1935, 293 U.S. 465, 470, 55 S.Ct. 266, 79 L.Ed. 596; United States v. Phellis, 1921, 257 U.S. 156, 168, 42 S.Ct. 63, 66 L.Ed. 180; Commissioner of Internal Revenue v. Ashland Oil & Refining Co., 6 Cir., 1938, 99 F.2d 588, 591, certiorari denied, 1939, 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057. Thus in analyzing multiple-step transactions, "transitory phases of an arrangement frequently are disregarded under these sections of the revenue acts where they add nothing of substance to the completed affair." Helvering v. Alabama Asphaltic Limestone Co., supra, 315 U.S. at pages 184–185, 62 S.Ct. at page 544; Liddon v. Commissioner, 6 Cir., 1956, 230 F.2d 304, 309, certiorari denied, 1956, 352 U.S. 824, 77 S.Ct. 34, 1 L.Ed.2d 48. Although the case involved another tax area, the following language from DuPont v. Deputy, D.C.Del.1938, 23 F.Supp. 33, is apt (23 F.Supp. at page 37):

> " * * * for the purpose of determining tax liability the courts look through the form of the transaction to the substance. * * * If the court finds the transaction is not what it appears to be it will be disregarded. The courts hold that a single transaction may not be broken up into various elements to avoid a tax. The various steps do not change the character of the transaction. ' "Transaction" is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.' "

So here, the Court is satisfied that the entire transaction must be viewed as an integrated whole. See Commissioner of Internal Revenue v. National Bellas Hess, 8 Cir., 1955, 220 F.2d 415; Bard-Parker Co. v. Commissioner, 2 Cir., 1954, 218 F.2d 52, 57, certiorari denied, 1955, 349 U.S. 906, 75 S.Ct. 582, 99 L.Ed. 1242; Barker v. United States, 9 Cir., 1952, 200 F.2d 223, 231; ACF-Brill Motors Co. v. Commissioner, 3 Cir. 1951, 189 F.2d 704, 707, certiorari denied, 1951, 342 U.S. 886, 72 S.Ct. 176, 96 L.Ed. 665; Hazeltine Corp. v. Commissioner, 3 Cir., 1937, 89 F.2d 513, 518; West Texas Refining & Development Co. v. Commissioner, 10 Cir., 1933, 68 F.2d 77, 80. So viewed, Fidelity retained no proprietary interest in plaintiff after the plan was carried through. The continuity of interest required by the rule to qualify the transaction as a tax free reorganization

under Section 112(b) (4) was, therefore, lacking.

■ Whether or not Section 112(b) (4) applies, plaintiff contends that the transaction by which it acquired the 1937 Assets from Products qualified as a "tax free transfer" under Section 112(b) (5), 49 Stat. 1679, of the Internal Revenue Act of 1936, as amended by the Internal Revenue Act of 1939, 53 Stat. 872. That Section provided:

> "*Transfer to corporation controlled by transferor.* No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation * * *."

For the purposes of this Section, Section 112(h) of the 1936 Act, 49 Stat. 1681, provided that "control" means the ownership of 80% of the stock of a corporation; and as in the case of Section 112(b) (4), the assumption of a liability is to be disregarded in applying Section 112(b) (5). Section 112(k), I.R.C.1939, 53 Stat. 870; American Bantam Car Co., 1948, 11 T.C. 397, 403; cf. Helvering v. Taylor, 2 Cir., 1942, 128 F.2d 885; Commissioner of Internal Revenue v. Corpus Christi Terminal Co., 5 Cir., 1942, 126 F.2d 898.[4]

■ The transfer of all of its assets by Products in exchange for all of the stock of plaintiff clearly comes within Section 112(b) (5) if the control requirement is met. And it is argued by plaintiff that such requirement is met since immediately after the transfer of its assets by Products to plaintiff, the transferor—which was either Products or, under the principles of Alabama Asphaltic Limestone Co. and Palm Springs Holding Corp., supra, Fidelity—owned all the outstanding stock of plaintiff. Plaintiff's position is predicated upon the proposition, which has been recognized by the courts, that the statutory requirement of control "immediately after the exchange" is met despite a subsequent transfer of the transferee's stock by the transferor; that, in fact, "momentary control" of the transferee by the transferor is sufficient to qualify a transaction as tax free under Section 112(b) (5). See, e. g., Portland Oil Co. v. Commissioner, 1 Cir., 1940, 109 F.2d 479, certiorari denied, 1940, 310 U.S. 650, 60 S.Ct. 1100, 84 L.Ed. 1416; Wilgard Realty Co. v. Commissioner, 2 Cir., 1942, 127 F.2d 514, certiorari denied, 1942, 317 U.S. 655, 63 S.Ct. 52, 87 L.Ed. 527; American Compress & Warehouse Co. v. Bender, 5 Cir., 1934, 70 F.2d 655, certiorari denied, 1934, 293 U.S. 607, 55 S.Ct. 123, 79 L.Ed. 698; American Bantam Car Company, 1948, 11 T.C. 397, affirmed per curiam, 3 Cir., 1949, 177 F.2d 513; Schmieg, Hungate & Kotzian, Inc., 1932, 27 B.T.A. 337.

■ For the reasons discussed above, it is the opinion of this Court that plaintiff's position, while technically correct, overlooks the substance of the transaction. The statutory requirement of control immediately after the exchange must still be met. And upon this record the Court cannot conclude that immediately after the transaction either Products or Fidelity was in control of plaintiff. When plaintiff issued its stock to Products,

4. Under Section 113(a) (8) of the 1939 Code, 26 U.S.C.A. (I.R.C.1939) § 113(a) (8), if a transaction meets the requirements of Section 112(b) (5), the basis of the property in the hands of the transferee corporation is the same as it would be in the hands of the transferor. That section provided:

> "*Property acquired by issuance of stock or as paid-in surplus.* If the property was acquired after December 31, 1920, by a corporation—
> "(A) by the issuance of its stock or securities in connection with a transaction described in section 112(b) (5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities) * * *
> * * * * * * *
> then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made."

Products simultaneously transferred, as it was under the obligation to transfer, the stock to Fidelity, and Fidelity sold, as it was under the obligation to sell, the stock to the Soule group, all as part of the same transaction. The transfer of the stock from Products to Fidelity and its sale by Fidelity to the Soule group was contemplated from the inception of the plan of reorganization; it was an integral part of the plan as adopted by the stockholders of Products and formalized by the written agreement signed by Mr. Soule, as President of Products and individually, and by Mr. Braun, as Conservator of Fidelity; and even assuming that there was, as plaintiff asserts, no *legally* binding obligation on Fidelity to sell plaintiff's stock to the Soule group,[5] it is manifest that the incorporation and exchange would never have been agreed upon without the supplemental agreement turning over the stock to Fidelity and eventually to the Soule group, which was, in fact, the *sine qua non* of the entire transaction. The series of steps which involved the organization of plaintiff, the exchange of Products' assets for plaintiff's stock, the transfer of plaintiff's stock by Products to Fidelity and the sale of the stock by Fidelity to the Soule group can only be considered as parts of a single integrated transaction. As stated by the Court in Barker v. United States, 9 Cir., 1952, 200 F.2d 223, at page 231:

"* * * each step in an entire transaction cannot be treated separately for income tax purposes. * * * Where, as here, the parties to a transaction formulated a plan which contemplated several steps to accomplish the end result, and bound themselves by contract to carry out the plan, the actions taken constitute a single transaction."

The facts here are distinguishable from those existing in the cases relied on by plaintiff, in which nothing appears to show any necessary connection between the receipt of stock by the transferors and its subsequent sale to the third parties. In situations such as that disclosed by the present record, the courts properly have refused to break up a unified transaction into its constituent elements, and have not hesitated to find that what was done amounted to one single transaction for income tax purposes. Hazeltine Corp. v. Commissioner, 3 Cir., 1937, 89 F.2d 513, 518; Bassick v. Commissioner, 2 Cir., 1936, 85 F.2d 8, certiorari denied, 1936, 299 U.S. 592, 57 S.Ct. 120, 81 L.Ed. 436; West Texas Refining & Development Co. v. Commissioner, 10 Cir., 1933, 68 F.2d 77; cf. May Broadcasting Co. v. United States, 8 Cir., 1953, 200 F.2d 852; S. Klein On the Square, Inc. v. Commissioner, 2 Cir., 1951, 188 F.2d 127, certiorari denied, 1951, 342 U.S. 824, 72 S.Ct. 44, 96 L.Ed. 623; Von's Investment Co. v. Commissioner, 9 Cir., 1937, 92 F.2d 861; see also Morgan Mfg. Co. v. Commissioner, 4 Cir., 1941, 124 F.2d 602, 605; Morgan v. Helvering, 2 Cir., 1941, 117 F.2d 334.

This Court is satisfied that the present transaction must be viewed as a whole. Upon receipt of plaintiff's stock on April 5, 1937 Products was bound to transfer it to Fidelity and Fidelity was under a distinct obligation to sell it to the Soule group. Under these circumstances, neither Products nor Fidelity was in control of plaintiff immediately

---

5. This is certainly a questionable assumption. It is based upon the failure of the record to disclose formal Court approval of the sale of plaintiff's stock by the Conservator to the Soule group prior to April 5, 1937. Despite this absence of evidence of formal Court approval, it is obvious that subsequent approval of the Conservator's accounts and termination of the Conservatorship by the Maine Court served to ratify the entire transaction. The point becomes immaterial, however, because, for the reasons previously stated, Fidelity cannot be regarded as having been the equitable owner of Products under the principles of Alabama Asphaltic Limestone Co. and Palm Springs Holding Corp., supra, from which it follows that Fidelity cannot be treated as the transferor of Products' assets for the purposes of Section 112(b) (5). Cf. Helvering v. Southwest Consolidated Corp., 1942, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789.

after the exchange. The control requirement of Section 112(b)(5) was not met.

For the foregoing reasons, the Court has concluded that the transaction by which plaintiff acquired the 1937 Assets from Products was not tax free under either Section 112(b)(4) or Section 112(b)(5), and hence plaintiff's basis of such Assets is not to be determined with reference to their basis in the hands of Products.

*(b)(i) The Fair Market Value of the 1937 Assets*

■ Since the acquisition of the 1937 Assets by plaintiff was not tax free, their tax basis in the hands of plaintiff is their *cost* to plaintiff. 26 U.S.C.A. (I.R.C.1939) § 113(a)[6].

■ What is plaintiff's "cost" for the 1937 Assets? In exchange for all of Products' assets, plaintiff assumed liabilities of $135,120.56 and issued 3,000 shares of common stock. Where stock is the consideration for an exchange of property, the fair market value of that stock is the "cost" by which the transferee's basis is determined. Champlin Refining Co. v. Commissioner, 10 Cir., 1941, 123 F.2d 202, 203; Commissioner of Internal Revenue v. Schumacher Wall Board Corp., 9 Cir., 1937, 93 F.2d 79, 82; Hazeltine Corp. v. Commissioner, 3 Cir., 1937, 89 F.2d 513, 518; Rice v. Commissioner, 1 Cir., 1931, 47 F.2d 99, 100; C. D. Johnson Lumber Corp., 1949, 12 T.C. 348, 363. At the time of the transfer, however, plaintiff's stock had no established market value. In such case, its value must be established by reference to the fair market value of the assets for which such stock was issued. Champlin Refining Co. v. Commissioner, supra; Elrod Slug Casting Machine Co. v. Commissioner, D.C.Neb.1944, 57 F.Supp. 915, 919; C. D. Johnson Lumber Corp., supra; Record Petroleum Co., 1935, 32 B.T.A. 1270, 1272; Swiss Oil Corp., 1935, 32 B.T.A. 777, 787; Gillette Rubber Co., 1934, 31 B.T.A. 483, 491; cf. Fahs v. Florida Machine & Foundry Co., 5 Cir., 1948, 168 F.2d 957, 959; Hunt v. Commissioner, 5 Cir., 1936, 82 F.2d 668, 670.

It is stipulated that the assets which were transferred to plaintiff by Products, other than the 1937 Assets, had a value as of April 5, 1937 which exceeded the amount of the liabilities which plaintiff assumed by $170,861.67.[7] Thus only the value of the 1937 Assets is in dispute. These consisted of the buildings, machinery and equipment comprising Products' South Portland plant.

■ The Commissioner has determined that, as of April 5, 1937, the value of the 1937 Assets was zero. There is a presumption of correctness which attaches to such a determination by the Commissioner. A. & A. Tool & Supply Co. v. Commissioner, 10 Cir., 1950, 182 F.2d 300, 302–303; Crude Oil Corporation of America v. Commissioner, 10 Cir., 1947, 161 F.2d 809. However, in the course of oral argument, counsel for the government stated that no reliance

---

6. "§ 113. *Adjusted basis for determining gain or loss.* (a) Basis (unadjusted) of property. The basis of property shall be the cost of such property * * *."

7. The stipulation recites that the assets so acquired, other than the 1937 Assets, were of the nature and had the values shown below:

Assets

| Cash | $ 12,760.18 |
|---|---|
| Accounts Receivable (Net) | 102,178.42 |
| Note Receivable | 38,783.59 |
| Merchandise Inventory | 132,483.23 |
| Land | 15,037.77 |
| Miscellaneous | 4,739.04 |
| | $305,982.23 |

Liabilities

| Accounts Payable | $ 80,236.26 |
|---|---|
| Mortgage Loan | 40,000.00 |
| Miscellaneous | 14,884.30 |
| | $135,120.56 |

| Excess of Assets over Liabilities | $170,861.67 |
|---|---|

was being placed by it on the presumptive correctness of the Commissioner's determination. He asserted that the government simply maintains that the burden of proof is upon the taxpayer to bring forth sufficient evidence from which the Court may determine the extent to which taxes were overpaid, citing Lewis v. Reynolds, 1932, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293. The Court can see no material difference in the two approaches. The presumption of correctness is a rebuttable presumption which will support a finding in favor of the Commissioner only in the absence of any substantial evidence to the contrary. Cullers v. Commissioner, 8 Cir., 1956, 237 F.2d 611, 614; A. & A. Tool & Supply Co. v. Commissioner, 10 Cir., 1950, 182 F.2d 300, 303; Crude Oil Corporation of America v. Commissioner, 10 Cir., 1947, 161 F.2d 809, and cases cited in footnote 1 thereof, at page 810. This is but another way of saying, as did the Supreme Court in Lewis v. Reynolds, supra, 284 U.S. at page 283, 52 S.Ct. at page 146 that "the action to recover on a claim for refund is in the nature of an action for money had and received and it is incumbent upon the claimant to show that the United States has money which belongs to him." It was, in fact, more succinctly and forcefully put by the Supreme Court in Helvering v. Taylor, 1935, 293 U.S. 507, at page 515, 55 S.Ct.

287, 291: "Unquestionably the burden of proof is on the taxpayer to show that the commissioner's determination is invalid." In sum, plaintiff seeking refund must convince this Court by substantial evidence, both that the Commissioner's determination is erroneous and that the 1937 Assets had a value beyond that fixed by the Commissioner. Roybark v. United States, 9 Cir., 1954, 218 F.2d 164; Lightsey v. Commissioner, 4 Cir., 1933, 63 F.2d 254; cf. Hodoh v. United States, D.C.N.D.Ohio 1957, 153 F.Supp. 822, 825. In the opinion of this Court, plaintiff has sustained its burden.

As indicated, the assets in question consisted of buildings, machinery and equipment. The uncontroverted testimony of a qualified expert witness [8] produced by plaintiff at the hearing was that the land and buildings acquired by plaintiff from Products had a value on April 5, 1937 of $97,500, of which $18,000 was allocated to the land and $79,500 to the buildings.[9] The uncontroverted testimony of a second qualified witness [10] produced by plaintiff, who had appraised plaintiff's assets in 1941, was that those items of machinery and equipment appearing on an itemized list of the assets appraised by him in 1941, which the parties had stipulated could be identified as having been transferred from Products to plaintiff on April 5, 1937, had a value as of April 5, 1937 of $143,800.[11]

8. Mr. Harry Schwartz, for 35 years engaged in the business of buying, selling, managing and appraising industrial and commercial properties in and about Portland, Maine.

9. Plaintiff's expert divided his appraisal of the buildings into $46,000 for the "snowplow" buildings and $33,500 for the "hardware" buildings. He testified that he had personally inspected the land and buildings involved in 1946 or 1947 and again had examined the buildings which remained just prior to the hearing. He further testified that there had been no comparable sales of similar property in or near 1937 and that he had therefore used an income capitalization method based upon an estimated annual rental for the square footage available. He estimated that 65,000 square feet was available for industrial rental at 18 cents per square foot in 1937; that the annual gross rent-

al would thus be $11,700; and that such rental, capitalized at 12%, indicated an appraisal figure for sales purposes of $97,500.

10. Mr. Percy Griggs, since 1908 an appraiser of industrial properties throughout the New England area for insurance and other purposes.

11. Plaintiff's expert broke down this value as follows:

| | |
|---|---|
| Machinery | $127,000 |
| Cranes & Hoists | 10,000 |
| Office Machines | 2,400 |
| Trucks & Scales | 700 |
| Fire Protection | 100 |
| Machine Foundations | 600 |
| Underground Conduits | 3,000 |
| | $143,800 |

Plaintiff also offered the testimony of Mr. Carl Henry, a member of the Soule group and an employee of Products and of

In view of this showing, the assignment by the Commissioner of a zero valuation to these assets is patently absurd. Concededly, the foregoing evidence was not heard by the Court until April, 1958, some 21 years after the transfer. Obviously, the assets were not then in the same condition as when acquired by plaintiff. Nevertheless, despite the extended lapse of time, plaintiff was able to produce evidence sufficient, in the Court's opinion, to substantiate the fair market value claimed for the assets in question. In reply, the government saw fit to introduce no evidence but to content itself with limited cross-examination of plaintiff's experts. As the Court stated in Anita M. Baldwin, 1928, 10 B.T.A. 1198, 1201:

> "We are thus confronted with a record in which not merely the preponderance but all of the evidence of value supports petitioner's contention.

> "It would seem to be a reasonable proposition that if the evidence adduced by one party in support of a proposed valuation is clear, convincing and uncontradicted and no reason for disbelieving or discounting such evidence is present, and if the adverse party neither weakens the testimony by cross-examination nor produces any evidence on his own behalf, the party producing the evidence should prevail."

See also Clinton Cotton Mills, Inc. v. Commissioner, 4 Cir., 1935, 78 F.2d 292, 295; Essex Motors, 1931, 22 B.T.A. 804. The Court cannot reject such evidence and make an arbitrary finding of value unsupported by evidence. A. & A. Tool & Supply Co. v. Commissioner, 10 Cir., 1950, 182 F.2d 300, 304; Phipps v. Commissioner, 10 Cir., 1942, 127 F.2d 214,

217, certiorari denied, 1942, 317 U.S. 645, 63 S.Ct. 38, 87 L.Ed. 519.

The Court therefore finds that the fair market value of the 1937 Assets on April 5, 1937 was $223,300, of which $79,500 was attributable to buildings and $143,800 to machinery and equipment.

*(b) (ii) Effect Of Basis Of The 1937 Assets On Plaintiff's Excess Profits Tax Credit*

In determining plaintiff's excess profits tax credit, based on the invested capital method, the Commissioner used $65,500 as the amount of property paid in for stock.[12] The Government has not attempted to support this position either in its brief or in oral argument.

Since the 1937 transaction was not tax free, the statute and regulation seem clear that the property paid-in component must be determined with reference to the fair market value of the assets for which the stock of plaintiff was issued. 26 U.S.C.A. Excess Profits Taxes, § 718(a); U.S.Treas.Reg. 112, § 35.718–1. It follows that the aggregate amount of the money and property paid-in components to be used in determining plaintiff's excess profits tax credit is the sum of $170,861.67 (the stipulated amount of the excess of all assets, other than the 1937 Assets, transferred to plaintiff over the liabilities assumed by plaintiff on April 5, 1937) plus $223,300 (the fair market value of the 1937 Assets as determined by the Court), a total of $394,161.67.

### Issue No. 2—Excess Depreciation

It has been stipulated that in determining the gain or loss realized by plaintiff in its fiscal year ended March 31, 1947 on the sale of its South Portland plant to Maine Specialty Co. on September 6, 1946, the Commissioner reduced

---

plaintiff, to the effect that the value of the machinery alone (valued by the first witness at $127,000) was not less than $150,000 on April 5, 1937. Mr. Henry's testimony was offered by plaintiff as the opinion of a corporate officer who had been personally familiar with the property. The Court has not, however, considered his opinion in arriving at a valuation of these assets.

12. The figure of $65,500 was designated in the Revenue Agent's Report as "money paid in" and was described as the amount paid by the Soule group for plaintiff's stock. As previously noted, the amount paid was $67,000.

the cost basis of the assets sold, other than the 1937 Assets, by $30,392.28, which represented depreciation allowed plaintiff on its income tax returns for its fiscal years ended in 1938 through 1940 (years which have been closed) with respect to the 1937 Assets, the basis of which he had determined to be zero. The effect of this was to increase the gain or reduce the loss on the sale by $30,392.28.

In the light of Pittsburgh Brewing Co., 1938, 37 B.T.A. 439, 445 (acq.), reversed on other grounds, 3 Cir., 1939, 107 F.2d 155, the Government has conceded that this treatment was erroneous, and this Court so holds.

### Issue No. 3—Deduction of Capital Stock Tax

It has been stipulated that on or about July 19, 1944 plaintiff filed a capital stock tax return and paid a capital stock tax of $12,500 with respect to its capital stock tax year ended June 30, 1944 and deducted that amount in determining its taxable income for its fiscal year ended March 31, 1945. The Commissioner determined that the deduction allowable on account of capital stock taxes for that fiscal year was only $2,500, which was the amount of capital stock tax paid by plaintiff in its fiscal year ended March 31, 1946 with respect to its capital stock tax year ended June 30, 1945. The stipulation further discloses that plaintiff has consistently accrued and deducted its capital stock tax in the year in which the capital stock tax return was filed and the tax paid.

■ The Government has conceded that the Commissioner's treatment was erroneous and contrary to Tax Court decisions, which the Commissioner has accepted, and to the Commissioner's own ruling. Tennessee Consolidated Coal Co., 1950, 15 T.C. 424, (acq. 1951–2 Cum. Bull. 4); E. & J. Gallo Winery, 12 T.C.M. 415 (1953) (conceded); GCM 24461, 1945–1 Cum.Bull. 111; cf. Cedar Rapids Engineering Co. v. United States, D.C. N.D.Iowa 1949, 86 F.Supp. 577. There would seem to be no question under the foregoing decisions and the Commission-er's acquiescence in them that plaintiff's treatment of this deduction was correct. Accordingly, the Court holds that plaintiff was entitled to deduct in its fiscal year ended March 31, 1945 $12,500 which it paid during that year as Federal capital stock taxes for the capital stock tax year ended June 30, 1944, rather than $2,500 paid the following year for the capital stock tax year ended June 30, 1945.

### Issue No. 4—Deduction of Vacation Pay

■ It has been stipulated that plaintiff's labor contract with the International Association of Machinists, Lodge 1256, entered into on June 3, 1946, provided for vacations with pay (or payment in lieu of vacation) as follows:

1. Each employee with one year's seniority (length of service from start of first employment) was on June 1, 1947 entitled to one week's vacation, or forty times his hourly rate of pay on said date.

2. An additional day's vacation (at eight times his June 1, 1947 hourly rate) for each year of seniority above one, but with a maximum vacation of two weeks or eighty times his June 1, 1947 hourly rate.

The vacation pay determined under the above schedule was subject to (a) reduction for absences of four or more consecutive weeks during the year, with certain exceptions, and (b) complete cancellation if an employee was discharged for cause.

At the close of its fiscal year ended March 31, 1947 plaintiff, being on the accrual basis, computed the estimated amount which would be due to its employees under the foregoing provision of its labor contract to be $6,225.25, accrued this amount and deducted it on its return. The Commissioner disallowed the entire deduction. The stipulation establishes that plaintiff's treatment of its vacation pay accrual for fiscal 1947 was consistent with its previous accounting practice and does not involve any duplication of deductions.

The Government has conceded the Commissioner's disallowance of this de-

duction to have been erroneous in light of his own rulings in I.T. 3956, 1949–1 Cum.Bull. 78; GCM 25261, Cum.Bull. 1947–2, p. 44; Revenue Ruling 54–608, 1954–2 Cum.Bull. 8; see also Section 97 of Pub.L.No. 85–866, 85th Cong., 2d Sess. (Technical Amendments Act of 1958), 26 U.S.C.A. § 162 note. Accordingly, the Court holds that for its fiscal year ended March 31, 1947 plaintiff was entitled to a deduction of $6,225.25 for vacation pay to union employees under union contract, which amount had been accrued at the close of that fiscal year with respect to vacations in the following year.

### Issue No. 5—Loss on Abandonment of Patent

 It has been stipulated that in its fiscal years ended in 1943 through 1946 plaintiff incurred the following expenses in securing a patent relating to the fabrication of wire rope sockets out of seamless tubing:

| Fiscal Year | Amount |
| --- | --- |
| 1943 | $ 445.50 |
| 1944 | 383.00 |
| 1945 | 629.65 |
| 1946 | 945.65 |
| | $2,403.80 |

Plaintiff claimed these amounts as deductions in the years of expenditure, but they were disallowed as current deductions by the Commissioner. By reason of the cancellation of Government contract following World War II, the patent became worthless and was abandoned by plaintiff in its fiscal year ended March 31, 1947. Though the abandonment resulted in the loss of the full cost of $2,403.80, the Commissioner allowed a deduction of only $828.50 (which appears to equal the total expenditures of 1943 and 1944 only) and disallowed the balance of $1,575.30.

No reason is given in the Revenue Agent's Report for the limitation of this deduction to $828.50 and counsel for the Government was unable to provide any explanation for the Commissioner's treatment. The Court can only surmise that the failure to allow a deduction of the full cost of the patent was an inadvertent error on the part of the examining officer. Since there appears to be no question but that plaintiff is entitled to the additional deduction of $1,575.30 in its fiscal year ended March 31, 1947, which was the year in which the abandonment took place and the loss was suffered (26 U.S.C.A. (I.R.C.1939) § 23(f); U.S.Treas.Reg. 111, § 29.23 e–3 and § 29.23 f–1), the Court holds that the loss sustained by plaintiff in the fiscal year ended March 31, 1947, on account of abandonment of the patent, was $2,403.80, rather than $828.50 as incorrectly determined by the Commissioner.

### Issue No. 6—Carry Back from 1946

 The stipulation recites a determination by the Commissioner that plaintiff sustained a net operating loss of $308,939.45 in its 1946 fiscal year. It is also stipulated that, before taking into account any operating loss deduction, plaintiff realized net income of $743,217.50 in its 1944 fiscal year, and that plaintiff's excess profits tax liability for that year was $573,370. In determining the net income of plaintiff for its 1945 fiscal year, the Commissioner allowed no deduction on account of the net operating loss carry back from its 1946 fiscal year. It is conceded that to the extent plaintiff is entitled to such a deduction, its 1945 excess profits taxes will be affected, for the resulting decrease in plaintiff's normal and surtaxes for its 1945 fiscal year (26 U.S.C.A. Excess Profits Taxes, § 711 (a)(2)(L)) will increase plaintiff's accumulated earnings and profits as of April 1, 1946, which will increase plaintiff's excess profits tax credit for its 1947 fiscal year, which in turn will be available as an unused excess profits tax credit carry back to plaintiff's 1945 fiscal year.

Under Section 122(b)(1) of the Internal Revenue Code of 1939, 26 U.S.C.A. (I.R.C.1939) § 122(b)(1), plaintiff's net operating loss of $308,939.45 for its 1946 fiscal year should first be applied as a carry back to its second preceding taxa-

ble year, which was plaintiff's 1944 fiscal year. Since the loss was less than the net income realized by plaintiff for that fiscal year (determined by the Commissioner to be $743,217.50), there would appear at first to be no loss remaining which could be carried to the 1945 fiscal year. However, Sections 122(b) and (d), when read together, provide that in determining the carry back to the fiscal year preceding the net operating loss, the net operating loss is to be reduced by the difference between the income of the second preceding year ($743,217.50) and the excess profits tax liability for that year ($573,370). Accordingly, by the Commissioner's own determination, the net operating loss of $308,939.45 exceeded the amount exhausted in plaintiff's 1944 fiscal year by $139,091.95, which is available as a carry back to its 1945 fiscal year, as follows:

| | | |
|---|---|---|
| Net Operating Loss 1946 | | $308,939.45 |
| Amount Exhausted in 1944: | | |
| Net income 1944 | $743,217.50 | |
| Less excess profits tax 1944 | 573,370.00 | 169,847.50 |
| Available as a carry back to 1945 | | $139,091.95 |

The Government did not question the correctness of the foregoing computation and did not brief or argue this point, but appeared to object to any determination of this issue by the Court in this proceeding on the grounds of variance, if any, from the claim for refund and possible application of the statute of limitations. Neither position was substantiated either by brief or oral argument. Under the clear wording of the statute, the 1946 loss did affect plaintiff's excess profits tax liability for its 1945 fiscal year, which is the subject matter of this proceeding. The Commissioner had before him all the facts necessary to make this adjustment, and he failed to apply the express language of the statute. See Scovill Mfg. Co. v. Fitzpatrick, 2 Cir., 1954, 215 F.2d 567; Bouchard v. United States, D.C.E.D.Wis.1956, 143 F.Supp. 5, 8; Westchester Fire Insurance Co. v. United States, D.C.S.D.N.Y.1955, 138 F.Supp. 788, 791. Accordingly, the Court holds that in determining the amount of plaintiff's net income for the fiscal year ended March 31, 1945 and plaintiff's unused excess profits tax credit for the fiscal year ended March 31, 1947 available as a carry back to the fiscal year ended March 31, 1945, the Commissioner erred in failing to give effect to the carry back of the net operating loss incurred in the fiscal year ended March 31, 1946, to the fiscal years ended March 31, 1944 and March 31, 1945.

### Order

In accordance with the stipulation of the parties, the Court having determined the issues presented to it, the parties shall, by agreement if possible, submit, within thirty days from the date hereof, computations pursuant to the Court's determination showing the correct amount of the net overpayment of excess profits taxes for the year 1945 to be entered as a judgment. In the event the parties are unable to agree as to the amount of such overpayment within said period of thirty days, each party shall, within fifteen days thereafter, file with the Court, and exchange with opposing counsel, a computation of the amount which it believes to be in accordance with the Court's decision, with the request that the Court determine the correct amount of such overpayment and enter its judgment accordingly.