Stewart F. Hancock v. Commissioner.
Hancock v. Commissioner
Docket No. 73048.
United States Tax Court
T.C. Memo 1960-230; 1960 Tax Ct. Memo LEXIS 62; 19 T.C.M. (CCH) 1293; T.C.M. (RIA) 60230; October 27, 1960
*62 Held: On the facts presented that the fair market value of two gifts from petitioner to his son in 1954 and 1955, each of a one-thirtieth interest in certain real property located in Syracuse, New York, was not in excess of $3,000 for each of said gifts. Robert V. Hunter, Esq., for petitioner. J. J. O"Toole, Esq., for respondent. BRUCE Memorandum Findings of Fact *63 and Opinion BRUCE, Judge: This proceeding involves gift tax deficiencies in the amounts of $1,752.61 and $2,100.22 for the years 1954 and 1955, respectively. The sole issue is the determination of the fair market value of fractional interests in buildings which were the subject of gifts from petitioner to his son. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Petitioner is an individual residing in Syracuse, New York. He filed his Federal gift tax returns for the years 1954 and 1955 with the district director of internal revenue for the district of Syracuse, New York. Petitioner has practiced law in the City of Syracuse for 52 years. For many years he has invested in real estate in the said city. On each of the dates January 2, 1954, and January 2, 1955, petitioner made gifts to his son, Stewart F. Hancock, Jr., of onethirtieth interests (each 1/5 of petitioner's 1/6 interest) in the City Bank Building and the Andrews Block, both located in Syracuse, New York. Petitioner reported a value of $3,000 for each of said one-thirtieth interests on the said Federal gift tax returns. The respondent placed a value on each gift *64 of a one-thirtieth interest of $12,800. The two aforementioned buildings were owned by Salina-Fayette-Clinton, Inc., a New York corporation incorporated July 12, 1950. The corporation was a mere nominee and held title for and on behalf of a syndicate formed in 1950, under an agreement dated July 5, 1950, which established a joint venture between the parties and provided that funds for the purchase of the City Bank Building and the Andrews Block would be furnished by certain mortgagees and the balance needed to complete the purchase would be advanced by the parties to the agreement as follows: Interest
T. Frank Dolan, Jr
1/6
H. Paul Nelligan
1/6
Stewart F. Hancock
1/6
Leo T. Eagan
1/4
Edward Eagan
1/4 Certain supplementary agreements were entered into by the above parties, none of which changed the relative interests as set forth above. H. Paul Nelligan died on May 17, 1952. His widow, Genevieve D. Nelligan, was appointed executrix under his will and in such capacity, she succeeded to his one-sixth interest in the syndicate. Upon organization of Salina-Fayette-Clinton, Inc., shares of capital stock were issued as follows: Shares
T. Frank Dolan, Jr
2
Stewart F. Hancock
2
H. Paul Nelligan
2
Leo T. Eagan
3
Edward Eagan
3
Total
12
*65 The corporation had dummy directors and dummy officers. The actual decisions were made by the members of the syndicate and all business of the corporation was carried out under their authorization. After the gifts made by petitioner in 1954 and 1955 and a similar gift to his son in 1953, the stock holdings in the corporation were as follows: Shares
T. Frank Dolan, Jr.
2.0
Stewart F. Hancock
.8
Stewart F. Hancock, Jr.
1.2
H. Paul Nelligan
2.0
(or Genevieve D. Nelligan)
Leo T. Eagan
3.0
Edward Eagan
3.0
Total
12.0
On July 21, 1950, Salina-Fayette-Clinton, Inc., purchased the City Bank Building and the Andrews Block for a total price of $900,000. The funds necessary to complete the purchase, including closing adjustments and funds to operate the buildings, were furnished by the following parties: Mutual Benefit Life Insurance
Company, first mortgage
$600,000
Dugnel, Inc., second mortgage
160,000
T. Frank Dolan, Jr., second
mortgage
40,000
Leo T. Eagan and Edward
Eagan, second mortgage
40,000
Ownership equities: H. Paul Nelligan
15,000
T. Frank Dolan, Jr.
15,000
Stewart F. Hancock
15,000
Leo T. Eagan and Edward
Eagan
45,000
Total
$930,000
*66 On October 3, 1952, a first mortgage of $1,050,000 was obtained from the Mutual Benefit Life Insurance Company upon refinancing of the existing mortgages. This mortgage called for quarterly payments of interest and principal in the amount of $21,000 commencing January 1, 1953, with the last payment due on October 1, 1967. Interest thereon was paid at the rate of 4 1/2 per cent. A second mortgage in the amount of $40,000 was placed on the property at or about the same time. The City Bank Building is located on the northwest corner of South Salina and West Fayette Streets, Syracuse, New York. This corner is located in the approximate center of the central business district of said city. South Salina Street is the principal street, running generally north and south through the central business district, along which are located the major stores in the central business district. West Fayette Street intersects South Salina Street at right angles, running generally east and west. In the same block to the north is located E. W. Edwards & Son, a major department store. In the block across the street on South Salina Street are located C. E. Chappel & Sons, Inc., a large department store, *67 and Lincoln Store, another department store. On the southeast corner of South Salina Street is located F. W. Woolworth & Co. On the southwest corner is located L. A. Witherill & Co., another department store. The City Bank Building is readily available to bus lines, banks, restaurants and shopping facilities. The Andrews Block is located immediately west of, and adjacent to, the City Bank Building, bordering on West Fayette and South Clinton Streets. The land on which the City Bank Building and the Andrews Block stand is made up of two parcels. The main parcel, which is the original City Bank Building lot, has a frontage on South Salina Street of 66.66 feet and a depth along West Fayette Street of 195.74 feet, with an ell of 8 feet east of the northwest corner of the plot, 33.50 feet deep on the east and west line, and 46.9 feet on the north line. Adjoining this plot to the west is the old Andrews property site which has a frontage along West Fayette Street of 77.30 feet and along South Clinton Street of 55.84 feet. The present City Bank Building and Andrews Block cover both plots of land. The City Bank Building is an 8-story fireproof building with stores on the first floor *68 and offices above. The lobby entrance for the offices is situated about 77 feet west of South Salina Street on West Fayette Street. It is a small lobby, approximately 11 feet by 24 feet, with two modern elevators and a marble stairway leading to the upper floors. There is also an entrance into the South Salina Street store. The ground floor has two stores. Walgreen Company (drug store) occupies all the space starting at the easterly side of the lobby and comprising the entire east corner of the building. Mohican Stores (food store) occupies the entire portion to the west of the lobby entrance. There is a basement under the entire building and the walls are stone and concrete. There are two Ames boilers which have conversion automatic oil burners. There is one large enclosed oil tank which stores approximately 10,000 gallons of oil. There are also two large hot-water tanks. On each floor, with the exception of the eighth, there are lavatories for men and for women, as well as janitor's rooms for storage of supplies. The area of the eighth floor is about half that of lower floors. The New York Telephone Company occupies all the space from the second to the eighth floor and because *69 of the one-tenant occupancy all floors are completely open, with the exception of private offices and departments being partitioned off as needed. The office space itself is well lighted with fluorescent lights and incandescent lighting fixtures. The floors are all covered with asphalt tile. Each floor has two wide court areas, so that all offices have daylight illumination. The City Bank Building has approximately 84,000 square feet of floor space and contains approximately 1,300,000 cubic feet. The building is in good condition. The Andrews Block is located on the corner of South Clinton and West Fayette Streets, immediately west of and adjacent to the City Bank Building. It is an old 4-story brick building. The first floor has 3 stores: a restaurant, a clothing store, and a cigar and candy store. The floors above are very old and completely unoccupied. There is a basement under the building with cut-stone walls and a concrete floor. The building is heated by the City Bank Building. The Andrews Block building contains approximately 21,170 square feet of floor space and approximately 230,000 cubic feet. During the years 1954 and 1955 the following leases were in effect: (a) *70 New York Telephone Company. This lease, dated July 31, 1951, provides for a 10-year term ending April 30, 1962. The lease covers the entire second, third, fourth, fifth, sixth, seventh and eighth floors of the City Bank Building. The annual rental provided for is $152,250. The lease contains an option to the tenant to renew for another term of 10 years at the expiration of the initial term, at the same rental but increased by the proportionate increase in taxes, maintenance and service costs over and above such costs and taxes prevailing at the time of the actual date of occupancy. The rentals include heat and elevator, janitor and window-cleaning and general cleaning services, but the tenant furnishes, at its own expense, any electricity or power used. The landlord was required to and did expend large sums of money in remodeling the upper floors of the City Bank Building in order to place them in usable condition for the single tenant, the New York Telephone Company. (b) Walgreen Company of New York, Inc. This lease, dated December 22, 1950, provides for a term commencing March 1, 1951, and ending February 28, 1971, and includes the South Salina and West Fayette Streets ground *71 floor corner area of the City Bank Building. Under its terms, the annual basic rental is $37,500. In addition to the basic annual rental, the tenant is required to pay the landlord, as additional rent, a sum equal to 4 per cent of the tenant's annual sales in excess of $1,062,500 arising from the operation of the tenant's store on the leased premises. The tenant has the right, at its election, to terminate the lease and the terms thereof on February 28, 1961. If the lease is not terminated on said date the tenant has the right to terminate the lease on February 28, 1966. (c) The Mohican Stores, Inc. This lease, dated December 12, 1950, provides for a term of 20 years commencing May 1, 1951, and ending April 30, 1971, at a minimum rental of $18,500, and includes the ground floor area and certain basement space of the City Bank Building west of the office lobby on West Fayette Street. In addition to the minimum annual rental of $18,500, the tenant agrees to pay an additional rent equivalent to 1 per cent of the net sales of the tenant of the leased premises in excess in one year of $1,850,000 per year. (d) Other leases. There were three leases in effect covering space in the Andrews *72 Block. Two of the leases were on a month-to-month basis. The annual rentals under those leases were as follows: M. P. Abramson, $4,200; Marvin Wilkins (Eaton), $2,400. The third lease, with Michael Carni, was for a term of 5 years beginning March 1, 1954, and ending February 28, 1959. It provided for an annual rental of $6,000. No additional rentals under the Walgreen and Mohican leases were paid in 1953 and 1954 because sales of neither tenant exceeded the minimum stated in their respective leases. Sales of each tenant, as computed under their respective leases, were as follows: Walgreen
Mohican
Year
Drug Company
Company
1952
$910,219.20
$1,682,703.01
1953
889,825.49
1,730,515.33
1954
890,115.65
1,620,702.45
1955
670,725.05
1,613,871.71
1956
647,667.95
1,561,188.47
1957
628,390.96
1,658,121.91
1958
594,271.90
(not available)
the assessed valuations for real estate tax purposes for 1953 and 1954 were as follows: City Bank Building
$849,600
Andrews Block
82,700
Real estate property taxes for the City Bank Building and the Andrews Block were as follows: 1954
$43,420.04
1955
44,660.71
Between 1950 *73 and 1953 various agreements were made between the syndicate members which provided, inter alia, for the payment of commissions to Eagan Real Estate, a partnership, which was appointed as managing agent for the City Bank Building and the Andrews Block. The agreements provided that Eagan Real Estate should receive commissions at the rate of 5 per cent upon the rent payable under any leases which might be negotiated by the Eagans and that Eagan Real Estate, as manager, should receive 5 per cent of the rental income received from the property. In the syndicate agreement dated October 16, 1953, between Leo T. Eagan, Edward Eagan, T. Frank Dolan, Jr., Stewart F. Hancock and Genevieve D. Nelligan, the members of the syndicate, and Eagan Real Estate, as manager, the following clause appears concerning the respective interests of the members of the syndicate and Eagan Real Estate: (a) That from the receipts of the property there shall first be paid installments of principal and interest due upon the first and second mortgages; that there shall next be paid all operating expenses, including sums due or to become due to Standard Syracuse Company, Hancock, Dorr, Ryan & Shove; and Smith, Dolan, *74 Gieselman & Gang; and that any balance of receipts then remaining should be paid to the party of the second part (Eagan Real Estate, Manager) to apply on commissions due or to become due; that no requests should be made from the parties of the first part (members of the syndicate) for further advances; that the parties of the first part (members of the syndicate) will forego any request for interest or other return upon their investments until the party of the second part (Eagan Real Estate, Manager) has been fully paid all commissions payable to it which have accrued but which have not been currently paid because of the provisions of this paragraph. As of December 31, 1953, the members of the syndicate agreed with Eagan Real Estate that the total commissions to which it would be entitled before the syndicate members received any return upon their investment would be $160,117.22. Eagan Real Estate maintains books and records of the nominee owner of City Bank Building and Andrews Block, Salina-Fayette-Clinton, Inc. Balance sheets prepared from said books and records and showing the combined interest of Stewart F. Hancock and Stewart F. Hancock, Jr., in the assets, liabilities and *75 net worth on December 31, 1953, and December 31, 1954, are as follows: Dec. 31,
Dec. 31,
ASSETS
1953
1954
Cash
$ 870.39
$ 481.31
Deferred Charges
30,260.65
27,488.33
$ 31,131.04
$ 27,969.64
Fixed Assets
Land
$ 49,491.22
$ 49,491.22
Buildings
103,922.36
103,922.36
Equipment
2,055.84
2,055.84
$155,469.42
$155,469.42
Less: Depreciation to
date
7,689.15
9,940.37
$147,780.27
$145,529.05
Total Assets
$178,911.31
$173,498.69
LIABILITIES
Withheld Taxes
$ 48.54
$ 64.15
Reserve for Fire Loss
667.26
First Mortgage Payable
167,123.78
160,534.19
Second Mortgage Pay-
able
4,166.67
2,166.67
Net Worth of Hancock
Interests
6,905.06
10,733.68
Total Liabilities
$178,911.31
$173,498.69
As of December 31, 1953, and December 31, 1954, there was owed but unpaid (1) to Eagan Real Estate, as manager, for commissions and other expenditures, $34,432.02 and $38,403.99, respectively, and (2) for legal services as of December 31, 1953, $815. These items were not included as liabilities on the foregoing balance sheets. If the foregoing items had been included in the balance sheets, then a one-sixth interest in the net worth in each *76 of the said years would be $1,030.56 in 1953, and $4,333.02 in 1954. A one-thirtieth interest in the net worth in each of the said years, allowing for commissions accruing to Eagan Real Estate, would be $206.11 in 1953, and $866.60 in 1954. H. Paul Nelligan, a member of the original syndicate, died on May 17, 1952, leaving his one-sixth interest to his widow, Genevieve D. Nelligan. She became a member of the syndicate in his place. The one-sixth interest in the Salina-Fayette-Clinton, Inc. Syndicate of H. Paul Nelligan was reported on his estate's Federal estate tax return at a value of $32,600. The value of the Nelligan one-sixth interest on May 17, 1952, as finally agreed upon between the Internal Revenue Service and the Nelligan estate on April 27, 1956, was $52,178.57. Petitioner, as counsel for the estate, recommended the acceptance of the $52,178.57 valuation. At the time of his death H. Paul Nelligan had a total investment of $27,605.04 in the syndicate. This amount consisted of his original investment of $15,000 and of an advance to the syndicate of $12,605.04. New mortgages of $1,050,000 and $40,000 were placed upon the property in the fall of 1952 and out of the proceeds *77 of these mortgages $12,605.04 was paid to Genevieve D. Nelligan as beneficiary of her husband's estate, thereby reducing the Nelligan investment in the property to the original amount of $15,000. In addition to the Salina-Fayette-Clinton syndicate there were other syndicates in which the same parties were members, including the Ann Lewis Syndicate, the Cronin Syndicate and the Stephens Syndicate. After H. Paul Nelligan's death his widow requested her syndicate associates either to obtain a purchaser for her interests in these four syndicates, or to make her an offer for her interests. The accountant for the syndicate manager reported that the value of the one-sixth interest in the Salina-Fayette-Clinton syndicate on December 31, 1954, was $10,733.68. Genevieve D. Nelligan thereupon offered to sell her one-sixth interest in the syndicate to her associates for $10,733.68. Petitioner, on February 23, 1955, wrote a letter to Genevieve D. Nelligan in which he stated, in substance, that because of the personal relation on the other members of the syndicate to her they could not, under any circumstances, purchase her share in the syndicate for an amount which would be less than her *78 husband's investment of $15,000. She consulted Scudder, Stephens and Clark, her investment counselors, and following further negotiations the two Eagans, T. Frank Dolan, Jr., and Stewart F. Hancock, Jr., purchased the Nelligan one-sixth interest for $15,000, upon the understanding that Genevieve D. Nelligan would retain her interest in the Cronin Syndicate. The fair market value of a one-thirtieth interest in the City Bank Building and Andrews Block on January 2, 1954, and on January 2, 1955, was not in excess of $3,000. Opinion The sole issue for our decision is the value for gift tax purposes of two gifts made by petitioner to his son in 1954 and 1955, each of which represents a one-thirtieth interest (or one-fifth of petitioner's one-sixth interest) in the City Bank Building and Andrews Block. [1] On his gift tax returns for the calendar years 1954 and 1955 petitioner reported the fair market value of each gift as $3,000. Respondent determined that the value of each one-thirtieth interest was $12,800. *79 Where, as here, a gift is made in property, the value thereof at the date of the gift is considered the amount of the gift for purposes of determining the gift tax. Section 1005, Internal Revenue Code of 1939; section 2512(a) of the Internal Revenue Code of 1954. The applicable regulations define "value" as "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having a reasonable knowledge of relevant facts." Regulations 108, section 86.19(a), under the 1939 Code, and Regulations section 25.2512-1, under the 1954 Code. In support of his valuation of the one-thirtieth interests petitioner relies upon the amount of his initial investment ($15,000 for petitioner's one-sixth interest); the sale of the Nelligan one-sixth interest in 1955 for $15,000; the net worth, or book value of the interests given; and the appraisal testimony of his expert witness. Petitioner has further submitted considerable evidence concerning the advent of suburban shopping centers, the drift of population and business to Syracuse suburbs, and the consequent decline of business in *80 downtown Syracuse, allegedly resulting in vacancies, declining rental rates, and depressed real estate values. On the other hand respondent submits that the physical character and nature of the building, its occupancy by tenants with long-term leases, its central location near stores which did not move to the suburbs, its accessibility to all forms of transportation, and, finally, the evidence of the higher value ($52,178.57) which was placed on the Nelligan one-sixth interest for estate tax purposes, all support respondent's determination. The question presented is one of fact and, as stated in the regulations mentioned above, "All relevant facts and elements of value as of the time of the gift shall be considered." Petitioner has the burden of overcoming the presumptive correctness of respondent's determination. In our opinion he has succeeded in doing so. It is not disputed that the City Bank Building is well constructed and in excellent physical condition with a useful life estimated at 30 to 40 years; that it is centrally located in the downtown business section of Syracuse, accessible to all forms of transportation; and that it is occupied by tenants with long-term leases, *81 the principal one, that of the New York Telephone Company, being for a period of ten years ending April 30, 1961, with an option to renew for an additional ten years, and the other two, Walgreen and Mohican Stores, each for 20 years ending in 1971. These facts alone, however, are not sufficient to establish the fair market value of the property involved as of the dates of the gifts. Respondent has offered no expert testimony of his own and the Court is without any personal knowledge upon which to form a conclusion as to such value. Respondent relies primarily upon the valuation agreed upon ($52,178.57) with respect to the one-sixth interest of the Nelligan estate for estate tax purposes as of May 17, 1952, and upon the presumptive correctness of his determination. The value agreed upon in the Nelligan estate is less than the valuation ($12,800 for a 1/30th interest, or $64,000 for a 1/6th interest) determined by respondent in the present case. Moreover, as was stated by the Eigth Circuit Court of Appeals in Fitts' Estate v. Commissioner, 237 F. 2d 729 affirming a Memorandum Opinion of this Court, "the valuation of the stock in the case of one taxpayer would be no binding *82 adjudication of its value in the case of another taxpayer, and such evidence would be of little probative value in the absence of a showing that the valuation was arrived at after a thorough investigation." Not only is there no showing here as to the basis of respondent's determination in the Nelligan estate, but the evidence clearly establishes that the relevant facts and elements of value as of the dates of the gifts in question were materially different from those which existed in May 1952. In May 1952 the property was subject to mortgages aggregating $840,000; in January of 1954 and 1955, the property was subject to mortgages aggregating $1,090,000. Moreover, the effect of the competition between the central business district in Syracuse and the suburban shopping centers, resulting in the decline of business in the downtown area, vacancies and declining rental rates, was more pronounced in 1954 and 1955 than in 1952. There is also evidence that petitioner, as counsel for the Nelligan estate and Genevieve D. Nelligan, recommended the acceptance of the $52,178.27 valuation placed upon the one-sixth interest of the Nelligan estate for the reason that the additional estate taxes resulting *83 therefrom would be more than offset by the capital loss deduction to which Genevieve would be entitled by reason of the sale of such one-sixth interest in 1955 for $15,000. Respondent has not challenged such reasoning. Considering all the facts and circumstances, it is our opinion that the presumption of the correctness of respondent's determination has been overcome. As stated in Cullers v. Commissioner, 237 F. 2d 611, 614, reversing on other grounds a Memorandum Opinion of this Court: The presumption of correctness is a rebuttable presumption and will support a finding in favor of the Commissioner only in the absence of any substantial evidence to the contrary. When the presumption has been overcome by evidence the presumption vanishes. Wiget v. Becker, 8 Cir., 84 F. 2d 706; A & A Tool & Supply Co. v. Commissioner, 10 Cir., 182 F. 2d 300; Mertens Law of Federal Income Taxation, Vol. 9, § 50.71. See also Maine Steel, Inc. v. United States, 174 F. Supp. 702, 715. We have found as a fact that the fair market value of a one-thirtieth interest in the City Bank Building and Andrews Block on January 2, 1954, and January 2, 1955, was *84 not in excess of $3,000. In so finding we have given no weight to petitioner's argument that this amount corresponds to his investment of $15,000 for a one-sixth interest in said property. We are concerned here with the question of fair market value as of the dates of the gifts, not with the grantor's basis. The two are not necessarily the same. We have, however, given considerable weight to the testimony of petitioner's expert witness, Malcolm A. Sutton, and to the facts relating to the sale of the one-sixth interest of Genevieve Nelligan in 1955. Sutton had been a realtor with many years experience in general real estate business in Syracuse. Prior to, during, and after the period involved, he had been the manager of six downtown office buildings and of approximately a dozen real estate syndicates. He was also interested in one of the larger suburban shopping centers. Respondent admitted his qualifications as an expert. Sutton appraised the fair market value of a one-thirtieth interest in the property involved as of January 2, 1954, and January 2, 1955, at $1,625. In so doing he testified he had inspected the buildings and had taken into consideration their physical condition, the *85 existing leases, as well as the agreements between the syndicate and Eagan Real Estate, and the income and expenses. He also took into consideration the effect of suburban shopping centers upon sales, rentals and real estate values in the downtown section of Syracuse, and the absence of any market for a one-thirtieth interest in the syndicate property to anyone except another member of the syndicate. His testimony was not controverted or materially weakened upon cross-examination. In fact, he testified that had he taken into account the amount then due and owing to Eagan Real Estate, but not shown as a liability on the balance sheets, he would have arrived at a lesser valuation for a one-thirtieth interest on the dates in question. Of particular significance herein, is the sale of a one-sixth interest in the syndicate property by Genevieve Nelligan in 1955. Shortly after the death of her husband in May 1952, Genevieve endeavored to sell her one-sixth interest in the City Bank Syndicate, as well as interests in three other syndicates, to the other members of the syndicate, or to have them obtain a purchaser for her interests. The accountant for the syndicate manager, having reported *86 to her that the book value of the one-sixth interest in the City Bank building syndicate as of December 31, 1954, was $10,733.68, Genevieve offered to sell such interest to the other members for that amount. Because of their personal relationship with Genevieve and her husband, the other members refused to purchase her interest for anything less than $15,000, the original amount of her husband's investment. Finally, after further negotiations, in a transaction stipulated to have been at arm's-length, the other members of the syndicate, on May 31, 1955, agreed to and did purchase her one-sixth interest for $15,000, upon condition that she retain her interest in the Cronin syndicate. It was anticipated by all the members that the Cronin syndicate would result in a loss. Both petitioner, who had had considerable experience in real estate ventures in Syracuse, and Sutton testified that because it represented a minority interest, the syndicate had never paid any dividends and was not expected to be able to pay any dividends in the foreseeable future, and the provisions of the Eagan Real Estate management contract, there was no market for a one-sixth interest other than to the other members *87 of the syndicate. Considering all of the relevant facts and elements of value presented herein we have concluded, and so hold, that the fair market value of a one-thirtieth interest in the City Bank Building and Andrews Block on January 2, 1954, and January 2, 1955, was not in excess of $3,000. Decision will be entered for the petitioner. Footnotes
1. Both parties consider the rest of the gifts as a fractional interest in the physical property, rather than as an interest in the syndicate of which petitioner was a member or in the corporation of which he was a stockholder.↩